**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 25 2003**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

STEPHEN M. GORDON; DIAMOND
G RANCH, INC., a Wyoming
corporation,

        Plaintiffs - Appellants,

v.

GALE NORTON, Secretary of the
Interior; UNITED STATES
DEPARTMENT OF INTERIOR;
UNITED STATES FISH AND
WILDLIFE SERVICE,

        Defendants - Appellees.

No. 01-8102

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(D.C. No. 98-CV-1025-D)**

---

John C. Martin, Patton Boggs LLP, Washington, D.C., (Susan M. Mathiascheck,
Alexandra V. Butler, Patton Boggs LLP, Washington, D.C.; Richard E. Day,
Williams, Porter, Day & Neville, Casper, Wyoming, with him on the briefs), for
Plaintiffs-Appellants.

Katherine J. Barton, U.S. Department of Justice, Washington, D.C., (Margot
Zallen, Of Counsel, U.S. Department of the Interior, Denver, Colorado;
Thomas L. Sansonetti, Assistant Attorney General, Washington, D.C.; David C.
Shilton, U.S. Department of Justice, Washington, D.C., with her on the brief), for
Defendants-Appellees.

Before **MURPHY**, **ANDERSON**, and **O'BRIEN**, Circuit Judges.

**MURPHY**, Circuit Judge.

## I.     INTRODUCTION

Appellants Stephen Gordon ("Gordon") and the Diamond G Ranch, Inc. ("Diamond G") challenge the Fish and Wildlife Service's ("FWS") control of gray wolves introduced under the Northern Rocky Mountain Wolf Recovery Plan ("Recovery Plan") near the Diamond G in the Dunoir Valley of northwestern Wyoming.  Seeking declaratory and injunctive relief, they filed this action in federal district court alleging violations of the Fifth Amendment Takings Clause and the regulations promulgated under the Endangered Species Act ("ESA").  The district court dismissed the takings claims for lack of subject matter jurisdiction and the ESA claims as not yet ripe for review.  This court has jurisdiction under 28 U.S.C. § 1291 and **affirms**.

## II.     BACKGROUND

### A.     The Northern Rocky Mountain Wolf Recovery Plan

The ESA is designed to protect and conserve endangered and threatened species and the ecosystems upon which they may be conserved.  16 U.S.C. § 1531(b).  To accomplish this, the ESA authorizes FWS, acting as proxy for the Secretary of the Interior, to identify endangered or threatened species and issue

regulations to conserve such species. *Id*. § 1533(a), (d). The ESA also authorizes the designation of nonessential, experimental populations of threatened species and the promulgation of rules concerning the management of such populations. *Id*. § 1539(j); *Wyo. Farm Bureau Fed'n v. Babbitt*, 199 F.3d 1224, 1229 (10th Cir. 2000).

The gray wolf has been listed as an endangered species in the lower forty-eight states, except Minnesota, since 1978. 50 C.F.R. § 17.11; *Wyo. Farm Bureau*, 199 F.3d at 1228. In 1994, the Secretary of the Interior adopted an updated Recovery Plan which called for the annual reintroduction of fifteen gray wolves in Yellowstone National Park and central Idaho, two nonessential, experimental population areas. *Wyo. Farm Bureau*, 199 F.3d at 1228-29. The Department of the Interior also adopted regulations to manage these populations. 50 C.F.R. § 17.84. These regulations authorize FWS to designate as problem wolves those animals that attack livestock once within a calendar year or attack domestic animals twice within a calendar year and to "take" such wolves. *Id*. § 17.84(i)(3)(vii). Authorized "takes" include: aversive tactics, nonlethal control, relocation, and lethal control. *Id.*

## B. Reintroduced Wolves on the Diamond G Ranch

In 1997, two reintroduced wolves and their five pups, a pack known as the Washakie Pack, traveled to the Diamond G in the Dunoir Valley. On October 8

and 11, 1997, the Diamond G reported potential wolf depredation of cattle to Wyoming Game and Fish personnel. None of the kills were confirmed as wolf kills. While no wolf depredation had been confirmed, FWS personnel joined Wyoming Wildlife Services ("WS") personnel to assist in controlling the Washakie Pack on October 16 because the adult male wolf had been observed chasing Diamond G cattle. FWS decided to try to trap the pack and move them to a pen in Yellowstone National Park. FWS and WS personnel also monitored and harassed the wolves in an attempt to deter them from Diamond G cattle. On October 19, another calf killing was discovered, and it was determined that wolves were responsible. FWS decided to kill the adult male wolf after observing it actively hunting cattle and determining that it had been involved in prior depredations in Montana. FWS also recommended, however, to observe the adult female wolf and the pups before making a decision regarding further control actions.

The adult female wolf and her pups remained together and were reportedly chasing cattle in November. No new depredations were reported and the cattle were moved to a lower elevation for winter. FWS continued to monitor the adult female wolf and the pups throughout the winter of 1997-98.

In a letter to FWS dated March 16, 1998, Gordon's attorney expressed his client's concern regarding the management of wolves on the Diamond G. Jaime

Rappaport Clark ("Clark"), Director of FWS, responded in a letter dated April 24, 1998 ("Clark Letter"). In this letter, Clark described the objectives of the Recovery Plan and FWS' efforts in minimizing wolf depredation of livestock; summarized the wolf depredation that occurred on the Diamond G in October 1997; described compensation plans; and described future plans for wolf management on the Diamond G.

The Diamond G Ranch Manager reported that a guard dog was attacked in April 1998. This attack was not confirmed as a wolf attack. Two other dogs, however, were confirmed to have been killed by a wolf in late April 1998. Gordon and Diamond G filed this action on June 2, 1998.

Three cattle kills were reported in June 1998, one of which was confirmed as a wolf kill and the other two were determined to be "highly probable" wolf kills. FWS decided to take further action to control the Washakie Pack and on June 21 killed the adult female wolf and one yearling pup. The Diamond G Ranch Manager reported additional cattle losses in July and August. No investigation occurred, however, because the carcasses were not reported for several days after they were found. By August 25, 1998, the remaining wolf pups moved to the Yellowstone National Park about 25-30 miles from Diamond G.

After the remaining wolves of the Washakie Pack dispersed, other wolves moved into the area near Diamond G. It is expected that these wolves may also depredate on Diamond G livestock.

## III. ANALYSIS

### A. Takings Claims

This court reviews *de novo* the district court's decision that it lacked subject matter jurisdiction over plaintiffs' takings claims. *See Madsen v. United States ex rel. United States Army Corps of Eng'rs*, 841 F.2d 1011, 1012 (10th Cir. 1987).

The Takings Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. CONST. amend. V. It is clear from this text that governmental interference with private property rights is not limited *per se*. First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 314-15 (1987). Rather, the Takings Clause is understood only to require *compensation* for a "proper interference amounting to a taking." *Id*. at 315. Accordingly, equitable relief is not available to enjoin a lawful taking when a property owner can subsequently sue the government for compensation. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984).

Generally, compensation for a taking may be obtained under the Tucker Act, which confers jurisdiction on the United States Court of Claims. 28 U.S.C. § 1491; *Preseault v. Interstate Commerce Comm'n*, 494 U.S. 1, 11-12 (1990). Thus, if a Tucker Act remedy is available, plaintiffs must first avail themselves of the process provided by the Tucker Act and file suit in the Court of Claims for compensation. *Preseault*, 494 U.S. at 11-12; *E. Enters. v. Apfel*, 524 U.S. 498, 520 (1998). A remedy is available under the Tucker Act unless Congress expresses an "unambiguous intention to withdraw the Tucker Act remedy." *Preseault*, 494 U.S. at 12. The ESA contains no language to indicate a Congressional intention to withdraw a Tucker Act remedy. Accordingly, the Court of Claims retains jurisdiction over takings claims that arise under the ESA. *See id*.

Plaintiffs argue, however, that the district court has jurisdiction over a takings claim when a plaintiff alleges irreparable harm from a continuing violation and seeks only equitable relief. Plaintiffs argue that the United States Supreme Court decision in *Eastern Enterprises* is dispositive of this issue. In *Eastern Enterprises*, the Supreme Court addressed the constitutionality of the Coal Industry Retiree Health Benefit Act of 1992 ("Coal Act"), 26 U.S.C. §§ 9701-9722, which mandated the contribution of money to a benefit fund established for retirees and their dependants. 524 U.S. at 503-04. Seeking

declaratory and injunctive relief, the claimant company in *Eastern Enterprises* filed a complaint in a federal district court alleging due process and takings claims. *Id*. at 517. A majority of the Court held that the Coal Act was unconstitutional. *Id*. at 538 (plurality opinion); *id*. at 539 (Kennedy, J., concurring in the judgment and dissenting in part). A different majority, however, concluded that the Takings Clause was not implicated by the Coal Act and that, instead, the controlling question was whether the Coal Act violated the substantive component of the Due Process Clause. *See id.* at 539-47 (Kennedy, J., concurring in the judgment and dissenting in part); *id*. at 554-58 (Breyer, J., dissenting). Accordingly, plaintiffs' argument that *Eastern Enterprises* is dispositive of their takings claims is unavailing.[1]

Moreover, plaintiffs' takings claims fail even under the plurality's analysis in *Eastern Enterprises*. The plurality in *Eastern Enterprises* noted that a claim for compensation under the Takings Clause must be brought first in the Court of Claims unless Congress expresses a clear intention to "withdraw[] the Tucker Act grant of jurisdiction." *Id*. at 520. The plurality reasoned, however, that the presumption of Tucker Act applicability is "reversed where the challenged statute, rather than burdening real or physical property, requires a direct transfer of funds mandated by the Government." *Id*. at 521 (quotation omitted). The plurality

---

[1] The Plaintiffs did not raise a due process claim.

reasoned that Congress could not have contemplated providing Tucker Act compensation for liability under the Coal Act because such a compensation scheme would require a dollar for dollar return of actual funds paid under the Coal Act. *Id.* By permitting claimants to seek a declaration of the constitutionality of the governmental activity prior to the taking, the plurality reasoned, an "utterly pointless set of activities" is avoided. *Id.* (quotation omitted). Accordingly, the plurality held that "[b]ased on the nature of the taking alleged" the district court had jurisdiction over the takings claim and the power to award declaratory and injunctive relief. *Id.* at 522.

The nature of the taking as discussed by the plurality in *Eastern Enterprises* is clearly distinguishable from the alleged taking at issue in this case. Unlike the claimant company in *Eastern Enterprises*, the lawfulness of the government action is not at issue. *See Wyo. Farm Bureau*, 199 F.3d at 1241 (holding that the Wolf Recovery Plan neither violated the ESA nor the National Environmental Policy Act). *Cf. Ramirez de Arellano v. Weinberger*, 745 F.2d 1500 (D.C. Cir. 1984) (holding that because the alleged taking was not lawful, the plaintiff was entitled to equitable relief and, moreover, the federal district court had jurisdiction over the plaintiff's claim), *vacated on other grounds*, 471 U.S. 1113, 1522-23 (1985).

Furthermore, the alleged taking in this case is not similar to the alleged statutory taking discussed by the plurality in *Eastern Enterprises*. Plaintiffs allege takings of physical property, such as cattle, dogs, and horses. The plurality in *Eastern Enterprises* distinguished takings of physical property and recognized that a Tucker Act remedy is available for such takings. 524 U.S. at 521. Accordingly, there is no reason to reverse the presumption of Tucker Act applicability to plaintiffs' takings claims for the loss of physical property. Plaintiffs also allege the taking of their business and lifestyle and argue that these takings are similar to the taking discussed by the plurality in *Eastern Enterprises*. This argument lacks merit. The nature of the alleged taking in *Eastern Enterprises* was noteworthy because it was clear that Congress had not contemplated that a plaintiff who alleged the taking of a sum of money would be required to sue the government under the Tucker Act for the return of the sum of money. *Id.* The plurality reasoned that in such a circumstance it was appropriate to permit the claimant company to forego the futile process of seeking Tucker Act compensation and to challenge the constitutionality of the government action directly. *Id.* By contrast, no such "utterly pointless set of activities" is created by requiring plaintiffs to seek Tucker Act compensation for the taking of business and lifestyle. *See id.*

Plaintiffs also argue that the district court has jurisdiction over takings claims when compensatory relief is inadequate. Plaintiffs, however, fail to present any persuasive support for this argument. They rely on *Southeast Kansas Community Action Program Inc. v. Secretary of Agriculture*, 967 F.2d 1452 (10th Cir. 1992), and *Hamilton Stores, Inc. v. Hodel*, 925 F.2d 1272 (10th Cir. 1991). No takings claims, however, were raised in those cases. Plaintiffs also cite *United States Fidelity & Guaranty v. McKeithen*, 226 F.3d 412 (5th Cir. 2000), *cert. denied*, 532 U.S. 922 (2001); and *Washington Legal Foundation v. Texas Equal Access to Justice Foundation*, 270 F.3d 180 (5th Cir. 2001), *rehearing en banc denied*, 293 F.3d 242 (5th Cir. 2002). Those cases are also easily distinguished. *Id*. The challenged takings in *United States Fidelity & Guaranty* and *Washington Legal Foundation*, similar to the alleged taking in *Eastern Enterprises*, involved the statutory taking of monetary assets. *United States Fid. & Guar.*, 226 F.3d at 417 (alleged taking arose from a statute under which insurers were charged based on benefits paid under insurance policies written before the statute's effective date); *Washington Legal Found.*, 270 F.3d at 184 (alleged taking arose from IOLTA program under which the state seized the interest earned on client-funds in IOLTA accounts). The nature of the property allegedly taken in this case is decidedly different from the liquid funds in *Eastern*

*Enterprises*, *United States Fidelity & Guaranty*, and *Washington Legal*

*Foundation*.

Therefore, because a Tucker Act remedy is available, the district court

lacked subject matter jurisdiction over plaintiffs' takings claims. Plaintiffs must

file their claims in the Court of Claims for compensatory relief.

**B.      ESA Claims**

**1.      The administrative record**

As a preliminary matter, the plaintiffs argue that the district court erred in

denying their motion to supplement the administrative record with the following:

the government's Wolf Control Plan concerning endangered wolves; videotape of

its investigation of a calf kill; evidence relating to attacks on Diamond G dogs in

April 1998; information on a meeting between FWS personnel and ranchers in

April 1998; verbal information provided to the government; evidence of

depredations prior to the fall of 1997 and after the April 24, 1998 letter; and

evidence of harm to the Diamond G. While the plaintiffs argue that this evidence

is pertinent to a review of the merits of their claims, they do not argue that it is

relevant to determining whether this case presents issues ripe for review.

Accordingly, because this court holds that it lacks subject matter jurisdiction over

the plaintiffs' ESA claims on the grounds of ripeness, this issue need not be

resolved.

## 2.  Ripeness

Under the ESA citizen-suit provision, "any person may commence a civil suit . . . to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of" the ESA "or regulation issued under" the ESA.  16 U.S.C. § 1540(g)(1)(A).  The APA governs judicial review of agency action challenged through the ESA citizen-suit provision.  *Coalition for Sustainable Res., Inc. v. United States Forest Serv.*, 259 F.3d 1244, 1249 (10th Cir. 2001).  A claim, however, must be ripe for a federal court to maintain subject matter jurisdiction.  *Park Lake Res. Ltd Liab. Co. v. United States Dep't of Agric.*, 197 F.3d 448, 450 (10th Cir. 1999).  In determining whether a case is ripe for review under the APA, the following factors are considered:

> (1) whether the issues in the case are purely legal; (2) whether the agency action involved is "final agency action" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 704; (3) whether the action has or will have a direct and immediate impact upon the plaintiff and (4) whether the resolution of the issues will promote effective enforcement and administration by the agency.

*Ash Creek Mining Co. v. Lujan*, 934 F.2d 240, 243 (10th Cir. 1991).  The district court applied the *Ash Creek* factors and determined that the plaintiffs' ESA claims were not ripe.

This court reviews the district court's dismissal of the plaintiffs' ESA claims for lack of jurisdiction on ripeness grounds *de novo* and "findings of

jurisdictional fact for clear error." *Coalition for Sustainable Res.*, 259 F.3d at 1249. The plaintiffs bear the burden of providing evidence of ripeness. *Id.* If a party challenges the factual basis for jurisdiction, the truthfulness of the factual allegations contained in the complaint are not presumed. *Id.* This court may consider evidence not contained in the pleadings and may resolve jurisdictional questions which do not also resolve substantive issues. *Id.*

Application of the *Ash Creek* factors to this case requires dismissal for lack of jurisdiction over plaintiffs' ESA claims.

### 1. Purely legal issues

If an issue is not purely legal, the court must exercise "greater caution . . . prior to concluding that [it] is ripe for review." *Coalition for Sustainable Res.*, 259 F.3d at 1250 (quotation omitted). Several issues involved in the review of plaintiffs' ESA claims require the interpretation of ESA regulations. For example, the parties dispute whether FWS is required under ESA regulations to relocate wolves that attack domestic animals twice within one year and remove chronic "problem" wolves that attack livestock. 50 C.F.R. § 17.84(i)(3)(vii). If this court were to conclude that the FWS has unfettered discretion to determine issues related to the control of wolves, plaintiffs' claims would fail as a matter of law. *Coalition for Sustainable Res.*, 259 F.3d at 1250. If, however, this court were to conclude as a matter of law that 50 C.F.R. § 17.84(i)(3)(vii) imposes

substantive requirements on the FWS, this court would then be required to examine related issues which require further factual development, i.e. what constitutes a chronic problem wolf and satisfactory removal of a wolf. *See id.* Accordingly, this case does not involve purely legal issues.

### 2.    Finality of agency action

To determine whether an agency action is final, this court examines "whether its impact is 'direct and immediate,' whether the action 'mark[s] the consummation of the agency's decisionmaking process,' and whether the action is one by which 'rights or obligations have been determined, or from which legal consequences will flow.'" *Colo. Farm Bureau Fed'n v. United States Forest Serv.*, 220 F.3d 1171, 1173-74 (10th Cir. 2000) (citation omitted) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997) and *Franklin v. Massachusetts*, 505 U.S. 788, 796-97 (1992)).  The FWS has not yet formally interpreted its regulations pertaining to the control of depredating wolves. *See* 50 C.F.R. § 17.84(i)(3)(vii).  Because this court defers to an agency's interpretation of its own regulations and the FWS has not finalized its interpretation of such regulations, consideration of this factor suggests the controversy is not ripe and the federal courts lack jurisdiction over plaintiffs' ESA claims. *See Roberts v. Colo. State Bd. of Agric.*, 998 F.3d 824, 828-29 (10th Cir. 1993) (holding that the agency's

interpretation of its own regulations are accorded substantial deference especially when the regulations are "effectively legislative").

An agency's failure to act, however, can also become a final agency action in three situations: 1) if the agency "affirmatively reject[s] a proposed course of action"; 2) if the agency delays unreasonably in responding to a request for action; and 3) if the agency delays in responding until the requested action would be ineffective. *Coalition for Sustainable Res.*, 259 F.3d at 1251.

Plaintiffs argue the following instances of inaction by FWS constitute final agency actions: 1) FWS' decision, evidenced in the Clark Letter, not to remove problem wolves without further evidence of depredation; 2) FWS' failure to uphold commitments made in the Clark Letter; and 3) FWS' failure to confirm kills as wolf kills.

Plaintiffs' argument that FWS' decision not to remove problem wolves, as evidenced in the Clark Letter, is a final agency action lacks merit. There is no affirmative language in the Clark Letter indicating a decision by FWS not to remove problem wolves. Rather, the language of the Clark Letter supports FWS' contention that it was still in the decision-making process and was continuing to gather information on wolf activity and depredations. This is evidenced by the statement that FWS would "continue to . . . closely monitor[]" the wolves and by the inclusion of a list of possible future actions, including the removal of the

wolves. Moreover, the Clark Letter does not purport to support an interpretation of the ESA or relevant regulations. *See Student Loan Mktg. Ass'n v. Riley*, 104 F.3d 397, 405-06 (D.C. Cir. 1997) (holding that under certain circumstances an agency letter that adopts an interpretation of law is a final agency action). Finally, FWS' postponement of its decision to remove the wolves did not create an unreasonable delay in agency action. FWS explained in the Clark Letter that the decision to continue monitoring the wolves prior to making a decision about future action was based upon the recent removal of the adult male wolf and the uncertainty whether the adult female wolf and the pups would continue to "localize activity near the [Diamond G] Ranch." Accordingly, FWS' failure to commit to removing the wolves in the Clark Letter was not a final agency action.

Plaintiffs' argument that FWS' failure to act on commitments made in the Clark Letter constituted a final agency action is similarly unavailing. FWS did not commit to any action in the Clark Letter, but rather expressed an intention to continue to monitor the wolves and develop more information before deciding to act. Additionally, any delay in FWS' decision-making process after the issuance of the Clark Letter was not unreasonable. FWS continued to monitor the wolves after Diamond G cattle returned for grazing and did take active steps to stop the depredation including the lethal removal of the adult female wolf and one yearling.

Finally, plaintiffs' argument that FWS' failure to confirm specific kills as wolf kills constitutes final agency action also fails. While the decision to designate a kill as a wolf kill may factor into FWS' decision-making process regarding future control actions, it does not have any immediate impact standing alone. Plaintiffs also argue that FWS has a policy of using a 100% certainty standard to confirm wolf killings and that use of this policy is a final agency action. After reviewing the record and the materials that are the basis of plaintiffs' motion to supplement, evidence of such a policy has not been presented. Accordingly, FWS' failure to designate specific kills as wolf kills is not a final agency action.

### 3. Direct and immediate impact from the agency inaction

The district court found that the direct and immediate impact on the plaintiffs from any agency inaction was uncertain because the Washakie Pack ceased to exist. Given the record before the court, the district court's decision that the Washakie Pack ceased to exist after August 1998 is not clearly erroneous.

Plaintiffs, however, argue that because of FWS' refusal to remove problem wolves, they have suffered harm from wolf depredations and will continue to suffer harm from other reintroduced wolves. Given that the district court found that the Washakie Pack ceased to exist, it is unclear whether FWS' delay in formulating a decision regarding the control of depredating wolves on Diamond G

will immediately impact the plaintiffs. Because there is no immediate threat to the plaintiffs from the FWS' delay, this case is not ripe for review. *See Coalition for Sustainable Res.*, 259 F.3d at 1252.

### 4. Promotion of effective administration

Addressing the merits of this case at this time will not promote efficacy in the administration of the Recovery Plan by FWS. As discussed above, FWS has continued to monitor the activities of the Washakie Pack on the Diamond G and to evaluate whether to take future action against the wolves. FWS has specialized expertise in the conservation and reintroduction of the wolves and should be permitted to decide how to appropriately balance the interests of the plaintiffs and the wolf recovery efforts. *Id*. at 1253. FWS has not yet formulated a definitive course of action will only undermine these efforts. Accordingly, addressing the merits of this case at this time will not increase the efficacy of the administration of the ESA.

## IV. CONCLUSION

For the foregoing reasons, this court **affirms** the district court's dismissal of plaintiffs' takings claims on the grounds that it lacks subject matter jurisdiction and plaintiffs' ESA claims as not yet ripe for review.