FILED
United States Court of Appeals
Tenth Circuit

August 27, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

LOS ALAMOS STUDY GROUP,

        Plaintiff - Appellant,

    v.

UNITED STATES DEPARTMENT
OF ENERGY; THE HONORABLE
STEVEN CHU, in his capacity
Secretary, Department of Energy;
NATIONAL NUCLEAR SECURITY
ADMINISTRATION; THE
HONORABLE THOMAS PAUL
D'AGOSTINO, in his capacity as
Administrator, National Nuclear
Security Administration,

        Defendants - Appellees.

No. 11-2141

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. NO. 1:10-CV-00760-JCH-ACT)**

Thomas M. Hnasko, Hinkle, Hensley, Shanor & Martin, LLP, Santa Fe, New
Mexico, (Dulcinea Z. Hanuschak, Hinkle, Hensley, Shanor & Martin, LLP, and
Lindsay A. Lovejoy, Jr., Law Office of Lindsay A. Lovejoy, Jr., Santa Fe, New
Mexico, with him on the brief), for Plaintiff - Appellant.

Robert P. Stockman, Environment & Natural Resources Division, United States
Department of Justice, Washington, DC, (Ignacia S. Moreno, Assistant Attorney
General, Washington, DC; Andrew A. Smith, John P. Tustin, Environment &
Natural Resources Division, United States Department of Justice, and Janet
Masters, Matthew F. Rotman, of counsel, Office of the General Counsel, U.S.
Department of Energy, with him on the brief), for Defendants - Appellees.

Before **BRISCOE**, Chief Judge, **McKAY**, and **HARTZ**, Circuit Judges.

**HARTZ**, Circuit Judge.

On August 16, 2010, Plaintiff Los Alamos Study Group filed a complaint for declaratory and injunctive relief under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4347, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706. Defendants were the National Nuclear Security Administration (NNSA), the United States Department of Energy (DOE), NNSA's administrator, and the DOE secretary. The complaint alleged that the design proposed for construction of a Chemistry and Metallurgy Research Replacement Nuclear Facility (the Nuclear Facility) at the Los Alamos National Laboratory (the Laboratory) had changed so much since the original environmental analysis in 2003 that a new analysis was required and that all work on the facility should be halted until the conclusion of such analysis. The district court dismissed the claims on two grounds: (1) that they were prudentially moot because Defendants began an environmental analysis after the complaint was filed and committed to refraining from all construction on the Nuclear Facility until the analysis was complete, and (2) that the case was not yet ripe because there had been no final agency action. We agree with the district court on the ripeness issue. We therefore need not address prudential mootness.

## I. BACKGROUND

### A. Regulatory Overview

NNSA is an agency within the DOE whose responsibilities include managing and securing the nation's nuclear weapons. As part of these responsibilities, NNSA administers the Laboratory in Los Alamos, New Mexico. The Laboratory supports various activities relating to nuclear weapons, including "nuclear materials handling, processing and fabrication; stockpile management; materials and manufacturing technologies; nonproliferation programs; and waste management activities." 69 Fed. Reg. 6967, 6968 (Feb. 12, 2004).

As a federal agency, NNSA must comply with the provisions of NEPA, which "declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989). NEPA does not require agencies to reach particular substantive environmental results. *See id.* at 350–51. But it "requires federal agencies to pause before committing resources to a project and consider the likely environmental impacts of the preferred course of action as well as reasonable alternatives." *Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 711 (10th Cir. 2010) (internal quotation marks omitted). Its dual goals are that the agency "consider every significant aspect of the environmental impact of a proposed action" and "inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas &*

*Electric Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (internal

quotation marks omitted).

To further these goals, NEPA requires thorough environmental studies

before official action:

> [B]efore an agency may take major Federal actions significantly
> affecting the quality of the human environment, an agency must
> prepare an environmental impact statement (EIS) in which the agency
> considers the environmental impacts of the proposed action and
> evaluates alternatives to the proposed action, including the option of
> taking no action.  In doing so, the agency must take a hard look at
> information relevant to its decision.

*Forest Guardians*, 611 F.3d at 711 (citations, brackets, and internal quotation

marks omitted).  If, after an EIS has been prepared, "there are substantial changes

to the proposal or significant new circumstances or information relevant to

environmental concerns," then a supplemental EIS (an SEIS) must be prepared.

10 C.F.R. § 1021.314(a).  An SEIS is prepared in the same manner as the original

EIS, except that the DOE is not required to allow the public to comment on the

scope of an SEIS.  *See id.* § 1021.311(a), (f); *id.* § 1021.314(d); 40 C.F.R.

§ 1501.7 (defining *scoping* as "an early and open process for determining the

scope of issues to be addressed and for identifying the significant issues related to

a proposed action").  If the DOE takes action on a proposal in an EIS or SEIS, it

must prepare a public record of decision (ROD), *see* 10 C.F.R. § 1021.315(b); *id.*

§ 1021.314(d), which states what the decision is, identifies and analyzes the

alternatives considered, and discusses means of avoiding or minimizing environmental harm from the selected alternative, *see* 40 C.F.R. § 1505.2.

### B.     Chemistry and Metallurgy Research Building

Many of the Laboratory's activities require facilities equipped to handle radioactive materials.  The most important of these facilities are located in the Chemistry and Metallurgy Research building (the CMR Building) and a separate plutonium facility (which is being upgraded in another project).  Some of the CMR Building's capabilities are apparently unique, such as its analytical-chemistry and materials-characterization functions.  In the late 1990s NNSA concluded that the CMR Building was "near the end of its useful life," 69 Fed. Reg. 6967, 6968, both because a seismic analysis had revealed that the building lacked sufficient structural integrity and because its components were aging. NNSA therefore began considering options for how and where to continue the functions performed at the CMR Building.  An EIS in 2003 analyzed four alternatives for the Chemistry and Metallurgy Research Building Replacement Project.  They varied in what buildings would be constructed and where they would be placed.  The ultimate choice for the project in the 2004 ROD, *see id.* at 6967–72, was "Alternative 1":  replacing the CMR Building with a new facility at Technical Area 55 comprised of two buildings:  a "consolidated nuclear material-capable, Hazard Category 2 laboratory building" (the Nuclear Facility), and "a separate, adjacent administrative office and support functions building," referred

to as the Radiological Laboratory Utility Office Building (the Office Building). 75 Fed. Reg. 60745, 60746 (Oct. 1, 2010). The project also involved the "construction of a parking areas(s) [sic], tunnels, vault area(s), and other infrastructure support needs." 69 Fed. Reg. 6967, 6968. The 2004 ROD was never challenged.

Over the following years the design changed, primarily to accommodate seismic and safety concerns. The changes have increased the scale and estimated cost of the proposed construction. For example, the original design for the Nuclear Facility called for a building with "a footprint of 300 by 275 feet, with one story below ground and one story above ground," Aplt. App., Vol. 3 at 568; but as of August 2010 the proposed building had a footprint of 342 by 304 feet, "with three levels below ground and one-and-a-half levels above ground," *id.* at 569. The estimated cost increased from $745 to $975 million for both the Office Building and the Nuclear Facility in 2005 to over $2 billion for just the Nuclear Facility in 2009.

### C. Later Environmental Studies

By July 30, 2010, these changes (and perhaps communications from Plaintiff) had led NNSA to conclude that it should prepare a Supplement Analysis to determine whether it needed an SEIS to update the 2003 EIS. *See* 10 C.F.R. § 1021.314(c) (requiring preparation of Supplement Analysis when "it is unclear whether or not an EIS supplement is required"). Before completing a Supplement

Analysis, however, NNSA decided to prepare an SEIS. Donald Cook, the Deputy Administrator for Defense Programs at NNSA, filed a sworn declaration stating that no Nuclear Facility construction would occur during the preparation of the SEIS. After two public meetings and a 45-day comment period, NNSA issued a Draft SEIS in April 2011. It held three public hearings on the Draft SEIS and accepted comments for 45 days. The final SEIS was published in August 2011—several months after the district court had issued its opinion in this case—and the Amended ROD was published in October 2011. Plaintiff is challenging the SEIS and the Amended ROD in a different action.

### D. Ongoing Activity at the Laboratory

Even as there have been reevaluations of the Nuclear Facility component of the project approved by the 2004 ROD, some other authorized actions have continued. Construction of the Office Building, for example, is complete. Construction of the Nuclear Materials Safeguards and Security Upgrades Project Phase II, which provides a security system at Technical Area 55, is ongoing. Also, design work for the Nuclear Facility has continued. The district court found that the design for the overall project was less than 50% complete, and during the SEIS process the design was expected to advance by only about 15%. By October 2010 approximately $210 million had been spent on design work for the Nuclear Facility. The Federal Project Director submitted a sworn declaration that the ongoing design process "[would] provide important information for the analysis

in the SEIS needed to understand and address uncertainties associated with the construction of the [Nuclear Facility]." Aplt. App., Vol. 3 at 822 (Declaration of Herman C. LeDoux at 2, *Los Alamos Study Group v. U.S. Dep't of Energy*, No. 10-CV-760 JCH/ACT (Dec. 20, 2010)).

### E. District-Court Proceedings

Plaintiff filed its complaint in the United States District Court for the District of New Mexico on August 16, 2010, soon after being notified that NNSA planned to prepare a Supplement Analysis, but before NNSA announced its decision to prepare an SEIS. The complaint contains five claims: (1) that Defendants are violating NEPA and the APA by failing to prepare an applicable EIS for the Nuclear Facility while implementing a proposal that differs substantially from any analyzed in the 2003 EIS; (2) that NEPA prohibits Defendants from proceeding with the Nuclear Facility before preparing a new EIS that considers connected actions and cumulative environmental impacts arising from other Laboratory projects; (3) that Defendants are violating NEPA by failing to identify mitigation measures and prepare a mitigation action plan for the current version of the proposed Nuclear Facility; (4) that Defendants are violating NEPA by failing to integrate required environmental analyses into their decisionmaking processes for revising plans for the Nuclear Facility; and (5) that Defendants are violating NEPA by not providing a notice or comment process for public input regarding the Nuclear Facility. In an October 4 motion to dismiss

-8-

under Fed. R. Civ. P. 12(b)(1), Defendants stated that they were conducting further environmental reviews, and argued that the claims were time-barred, would not be ripe until completion of the SEIS and issuance of a ROD, and were moot.

The district court referred the matter to a magistrate judge, who issued proposed findings and a recommended disposition on January 6, 2011. After reviewing de novo the findings and recommendation and holding two additional hearings, the district court issued a May 23 opinion holding that the complaint should be dismissed as prudentially moot and unripe. Regarding ripeness, the court held that because the SEIS process was ongoing, there was no "final agency action" for a court to review. Aplt. App., Vol. 2 at 331 (Mem. Op. & Order at 18, *Los Alamos Study Group*, No. 10-CV-760 JCH/ACT (May 23, 2011) (internal quotation marks omitted)). In response to Plaintiff's contention that Defendants were making an irretrievable commitment of resources to the Nuclear Facility project, the court said that Defendants had made no decision formally allowing detailed design and construction and that Nuclear Facility construction would not begin before completion of the SEIS. Although $210 million had been spent on the project during the prior six years, the court noted that the money had been for "building design and analysis" and that "the expenditure of even large amounts of money on design does not indicate that NNSA has made an irreversible and irretrievable commitment of resources, because design work is ongoing and

neither a final SEIS nor a final approval for construction has been issued." *Id.* (internal quotation marks omitted). The court also found that Plaintiff had not shown that the result of the environmental analysis had been predetermined.

Plaintiff appealed. The parties then filed additional motions in this court. Defendants filed a motion for summary disposition on November 1, 2011, arguing that the issuance of a final SEIS and Amended ROD rendered the case constitutionally moot. Plaintiff responded that the case was not moot because the NEPA violations were continuing. Then, on March 6, 2012, Plaintiff filed a motion to supplement the record, vacate the judgment below, and remand under Tenth Circuit Rule 27.2(A)(1) because the DOE/NNSA 2013 budget request allegedly contradicted the SEIS. Defendants responded that the motion did not comply with Rule 27.2 and that the budget proposal was not a final agency action.

On appeal Plaintiff argues that the issues are neither prudentially moot nor unripe and that the district court erred in resolving factual issues in favor of Defendants despite conflicting evidence supporting Plaintiff. Because we agree with the district court that the issues presented are not ripe, we do not decide the prudential-mootness question.

## II. ANALYSIS

### A. Procedural Issues and Standard of Review

Plaintiff raises two procedural objections to the district court's disposition of Plaintiff's motion to dismiss. First, it contends that the court should have

converted Defendants' Rule 12(b)(1) motion to dismiss into a motion for summary judgment. Such a conversion would have restricted the court's authority to weigh evidence. Ordinarily, "[w]hen a motion relies on facts outside the record, the court may hear the matter on affidavits or may hear it wholly or partly on oral testimony or on depositions." Fed. R. Civ. P. 43(c). In particular, when considering a Rule 12(b)(1) motion to dismiss, the court may weigh the evidence and make factual findings. *See Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995) ("When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations. A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)." (citation omitted)). When ruling on a summary-judgment motion, however, the court must view the evidence in the light most favorable to the party opposing the motion. *See In re Wal-Mart Stores, Inc.*, 395 F.3d 1177, 1189 (10th Cir. 2005).

Plaintiff relies on an exception to the general rule permitting the weighing of evidence in Rule 12(b)(1) proceedings. We have held that the district court must convert a 12(b)(1) motion into a summary-judgment motion if "resolution of the jurisdictional question is intertwined with the merits of the case." *Holt*, 46 F.3d at 1003. Whether the issues are so intertwined is generally determined by whether "subject matter jurisdiction is dependent on the same statute which

provides the substantive claim in the case." *Id.* ("Here, resolution of the jurisdictional issue—*i.e.*, whether the government is immune from suit under [the Flood Control Act of 1928]—does not depend on the [Federal Tort Claims Act] which provides the substantive claims in the case. Thus, the district court properly treated the government's motion as one brought pursuant to Rule 12(b)(1)."). Plaintiff contends that this exception applies because "NEPA provides the basis for federal question jurisdiction and for the substantive claim." Aplt. Br. at 53.

We do not address this contention because it was waived below. Plaintiff's brief in response to Defendants' motion to dismiss contains a one-paragraph section entitled "Legal Standard," which states in part: "The Court has broad discretion to freely weigh affidavits and other documents in resolving the jurisdictional issue. In the following Response and documenting submittals, [P]laintiff has provided significantly more than a preponderance of evidence that this Court has subject matter jurisdiction over this litigation." Aplt. App., Vol. 1 at 86 (citations omitted). A party cannot ask the district court to do something and then complain on appeal that the court complied with the request. *See ClearOne Commc'ns, Inc. v. Bowers*, 643 F.3d 735, 771 (10th Cir. 2011) (invited-error doctrine).

Plaintiff's second procedural complaint is that the magistrate judge erred in denying leave for discovery on the issues raised by Defendants' motion to

dismiss. But Plaintiff never sought review by the district court of the magistrate judge's decision, so Plaintiff is not entitled to consideration by this court of the denial. *See Centennial Archaeology v. AECOM*, No. 11-8000, 2012 WL 3055942, at \*9 (10th Cir. July 27, 2012); *Niehaus v. Kansas Bar Ass'n*, 793 F.2d 1159, 1164–65 (10th Cir. 1986), *superseded by statute on other grounds as stated in De Vargas v. Mason & Hanger-Silas Mason Co.*, 911 F.2d 1377, 1383–84 (10th Cir. 1990).

We now turn to the merits of the district court's decision that the case is not ripe for review. We review the decision de novo, *see Utah v. U.S. Dep't of Interior*, 535 F.3d 1184, 1191 (10th Cir. 2008), although we review for clear error any findings of historical fact, *see Gordon v. Norton*, 322 F.3d 1213, 1219 (10th Cir. 2003). Plaintiff bears the burden of showing ripeness. *See id.*

## B. Ripeness

The ripeness doctrine prevents courts "from entangling themselves in abstract disagreements over administrative policies, and also . . . protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as

-13-

anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks omitted).

One set of factors for determining ripeness is set forth in *Qwest Communications International, Inc. v. FCC*, 398 F.3d 1222, 1231–32 (10th Cir. 2005): "(1) whether the issues involved are purely legal, (2) whether the agency's action is final, (3) whether the action has or will have an immediate impact on the petitioner, and (4) whether resolution of the issue will assist the agency in effective enforcement and administration."[1] Here, the second factor—the finality of agency action—is all we need consider, because the absence of final agency action is dispositive. *See Friends of Marolt Park v. U.S. Dep't of Transp.*, 382 F.3d 1088, 1093–94 (10th Cir. 2004) ("[W]hether the issues are fit for review depends on whether the plaintiff challenges a final agency action."); *Park Lake Res. Ltd. Liab. Co. v. U.S. Dep't of Agric.*, 197 F.3d 448, 450 (10th Cir. 1999) (citing the APA, 5 U.S.C. § 704, which limits review to final agency actions and actions made reviewable by statute).

An agency's action is final if it satisfies two requirements: "First, the action must mark the consummation of the agency's decisionmaking process—it

---

[1] We have also articulated a three-factor test: "1) whether delayed review would cause hardship to the plaintiffs; 2) whether judicial intervention would inappropriately interfere with further administrative action; and 3) whether the courts would benefit from further factual development of the issues presented." *Sierra Club v. U.S. Dep't of Energy*, 287 F.3d 1256, 1262–63 (10th Cir. 2002). But the two tests "essentially include[] all the same considerations." *Coal. for Sustainable Res., Inc. v. U.S. Forest Serv.*, 259 F.3d 1244, 1250 n.11 (10th Cir. 2001).

must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations and internal quotation marks omitted); *see Ctr. for Native Ecosystems v. Cables*, 509 F.3d 1310, 1329 (10th Cir. 2007) (quoting *Bennett*).  Neither requirement is satisfied here.  As the district court found, the decisionmaking process for building a Nuclear Facility was ongoing:  "The [SEIS] process [was] still open to public participation and it [was] unclear . . . what form the SEIS and associated ROD [would] take."  Aplt. App., Vol. 2 at 329 (Mem. Op. & Order at 16, *Los Alamos Study Group*, No. 10-CV-760 JCH/ACT (May 23, 2011)).  And the agency had made no decision determining any rights or obligations:  no Nuclear Facility construction was occurring, the project design was less than 50% complete, and NNSA was still evaluating sizing, layout, and excavation options. *See Bennett Hills Grazing Ass'n v. United States*, 600 F.2d 1308, 1309 (9th Cir. 1979) (judicial review of draft SEIS was not warranted because courts should not interfere until agency makes decision).

Plaintiff argues that its claims are ripe because (1) NEPA requires the preparation of an EIS before "irreversible and inretrievable commitments of resources to an action that will affect the environment," Reply Br. at 20 (internal quotation marks omitted); (2) Defendants have made such commitments to the Nuclear Facility; and (3) once an EIS is required, the court can act because "'a

person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get any riper,'" *id.* at 29, quoting *Ohio Forestry Ass'n, Inc. Sierra Club*, 523 U.S. 726, 737 (1998).  Plaintiff cites several cases in support. Those, and other, cases turn on whether the agency has committed to an action that eliminates its ability to prevent later adverse environmental consequences, such a binding commitment being final agency action for NEPA purposes.  For example, in *New Mexico ex rel. Richardson v. Bureau of Land Management*, 565 F.3d 683, 718 (10th Cir. 2009), the issuance of a lease without a no-surface-occupancy stipulation was an irretrievable commitment because the agency could not prevent environmental impacts caused by the lease after its issuance.  *See also Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 480 (D.C. Cir. 2009) (challenge to first stage of multistage lease program was not ripe when agency would be conducting additional analyses in later stages that could scuttle the program); *Wyoming Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 49–50 (D.C. Cir. 1999) (focusing on whether the agency had given up the authority to preclude the relevant activities and concluding that there was no irreversible commitment because until leases were issued the Forest Service could "undertake additional efforts to comply with its NEPA obligations"); *Conner v. Burford*, 848 F.2d 1441, 1450 (9th Cir. 1988) (sale of leases required EIS because after the sale the government could not preclude "activities [that were] likely, if

-16-

not certain, to significantly affect the environment"); *Mobil Oil Corp. v. FTC*, 562 F.2d 170, 171–73 (2d Cir. 1977) (even when an agency indicated at the beginning of an administrative proceeding what remedies it expected ultimately to request, there was no irreversible commitment because the proceeding's outcome was merely speculative).

Plaintiff, however, has identified no actions that irreversibly lead to construction of the Nuclear Facility (and any resulting environmental injury). Instead, it identifies only interlocutory actions that have no necessary consequences for the facility.[2] We now address in turn the actions relied on by Plaintiff.

### 1. Ongoing Construction

One of Plaintiff's primary arguments is that ongoing construction at the site constitutes an irreversible commitment to build the Nuclear Facility. But the district court found that no construction on the Nuclear Facility was occurring during the SEIS process and that the construction already completed or underway had been approved independently of the Nuclear Facility. Plaintiff has not shown how any ongoing construction bound Defendants to build the Nuclear Facility.

---

[2] We need not decide whether the present case became ripe upon preparation of the SEIS or the issuance of the ROD, because Plaintiff does not argue ripeness on that ground. Although we have a duty to determine whether we *lack* jurisdiction to hear a case—a duty that arises because we have no authority to decide a matter when we lack jurisdiction—we have no duty to investigate grounds *for* jurisdiction not raised by a party. *See Somerlott v. Cherokee Nation Distribs., Inc.*, No. 10-6157, 2012 WL 3055566, at *6 (10th Cir. July 27, 2012).

## 2. Design Work

As for design work—another allegedly irreversible commitment to build the Nuclear Facility—the district court found that "NNSA is still evaluating the aspects of relative sizing and layout of the proposed [Nuclear Facility], and the overall project design is less than 50 percent complete." Aplt. App., Vol. 2 at 320 (Mem. Op. & Order at 7, *Los Alamos Study Group*, No. 10-CV-760 JCH/ACT (May 23, 2011)). As Plaintiff said in the complaint, Defendants had not even made decisions classified as either "'Critical Decision 2'" or "'Critical Decision 3,'" which would "formally allow detailed design and construction, respectively." *Id.*, Vol. 1 at 17 (Compl. for Declaratory J. & Injunctive Relief at 7, *Los Alamos Study Group*, No. 10-CV-760 JCH/ACT (Aug. 16, 2010)). The present level of design work does not prevent Defendants from considering alternative designs. *Cf. New Mexico ex rel. Richardson*, 565 F.3d at 718 (sale of lease without no-surface-occupancy stipulation was an irretrievable commitment because the agency could not prevent environmental impacts caused by lessee after its issuance). No legal consequences flow from the design work thus far and it determines no rights or obligations. *See Bennett*, 520 U.S. at 177–78. The Ninth Circuit made the same observation when considering an agency's decision that it would "partially fund preliminary design and engineering work":

> Neither this decision nor the design and engineering work that will follow will have any impact upon appellants in and of themselves. The threat that such an impact will eventually occur is neither

immediate nor certain. The [agency] has explicitly disavowed any advance commitment to approve construction. The design and engineering work is still in progress.

*Rapid Transit Advocates, Inc. v. S. Cal. Rapid Transit Dist.*, 752 F.2d 373, 378 (9th Cir. 1985) (dismissing case).

### 3. Administration Support

Plaintiff next suggests that support for the project by the highest levels of the Executive Branch shows that there has been final agency action. But it cites no case law that such support makes a decision irreversible. And in any event a commitment to a particular Nuclear Facility plan is not demonstrated by the evidence it cites: a letter from the Vice President stating the Administration's "unequivocal commitment to recapitalizing and modernizing the nuclear enterprise," Aplt. App., Vol. 6 at 1736; a White House press release stating the Administration's commitment "to requesting the funding needed" to complete the full Chemistry and Metallurgy Research Replacement facility, *id.* at 1737; a letter from Senator John Kyl questioning the Administration's commitment; and a November 2010 article in the *Nuclear Weapons & Materials Monitor* that discusses political negotiations regarding Senate support for the START treaty in return for sufficient long-term funds to "moderniz[e] . . . the nation's weapons complex and arsenal." *Id.*, Vol. 3 at 696. General statements about nuclear policy create no rights or obligations regarding the Nuclear Facility. Indeed, in a March 6, 2012, motion to this court, Plaintiff asserts that the Administration's

current proposal is to defer construction of the Nuclear Facility for at least five years.

### 4. Budget Proposal

Also in the March 6 motion, Plaintiff argues that February 2012 budget materials show that Defendants are considering new alternatives for the Nuclear Facility. Plaintiff asks that we supplement the record with these budget materials "to dispose of any claims of prudential mootness or ripeness." Pl.-Appellant's Mot. to Supplement the Record, to Vacate the J. Below, & to Remand Pursuant to Tenth Cir. Rule 27.2(A)(1) at 5 (*Los Alamos Study Group v. U.S. Dep't of Energy*, No. 11-2141 (10th Cir. Mar. 6, 2012)). But a budget request is no more a final agency action than an offer is a contract. A request is not a binding legal obligation. Indeed, even the appropriation of funds for construction would not necessarily create final agency action absent final agency approval. *See Rapid Transit Advocates*, 752 F.2d at 379. To the extent that the budget materials have any relevance (and the logic of Plaintiff's argument is far from clear to us), they only emphasize that the conception of the Nuclear Facility is everchanging, with no definitive decisions having been made.

### 5. Contractor's Performance-Evaluation Plan

About the time this suit was filed, the performance-evaluation plan for the management and operating contractor, Los Alamos National Security, LLC (LANS), included an award term based on LANS taking "[a]ctions necessary to

-20-

issue and execute construction contracts." Aplt. App., Vol. 6 at 1670. Plaintiff apparently believes that this term establishes a binding commitment to construct the Nuclear Facility. We think that conclusion is a stretch; but the issue is no longer before us anyway because the plan was amended to eliminate that obligation. Once the term was eliminated, which was before the district court dismissed this case, it could no longer be the basis for finding this case ripe. *See Anderson v. Green*, 513 U.S. 557, 559 (1995) ("[R]ipeness is peculiarly a question of timing" and must be judged at the time of review. (internal quotation marks omitted)); *Hooker Chem. Co. v. EPA*, 642 F.2d 48, 52–53 (3d Cir. 1981) (case was not ripe when agency withdrew orders after the plaintiff filed petitions for review); 13B Charles A. Wright et al., *Federal Practice and Procedure* § 3532.1, at 390 (3d ed. 2008) ("Many [cases] find that although a dispute was once ripe, ripeness has been lost to overtaking events.").

### 6.    2010 Project-Update Presentation

Plaintiff notes that a June 2010 project-update presentation states that LANS should "'plan for [Nuclear Facility] completion by 2020 with operations in 2022.'" Aplt. Br. at 57 (quoting Aplt. App., Vol. 6 at 1653). But planning for an event and committing to its realization are not the same thing. *See Bell v. Bonneville Power Admin.*, 340 F.3d 945, 950 (9th Cir. 2003) (challenge was not ripe when agency had "made only future plans to negotiate and support" but had not made the relevant acquisition that might violate the statute). Although

-21-

Plaintiff also asserts that the presentation demonstrates that "[c]ontracts for interior fixtures have been let," Aplt. Br. at 57 (citing Aplt. App., Vol. 6 at 1650–67), the cited pages do not support the assertion.

Because the district court properly found that Defendants had not yet taken any action requiring an environmental study for the Nuclear Facility, we affirm its holding that Plaintiff's claim was not ripe.

## III.    CONCLUSION

We AFFIRM the district court's dismissal of Plaintiff's suit.  We DENY all pending motions.