**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 21, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

PURGATORY RECREATION I, LLC, a
Delaware limited liability company;
PURGATORY VILLAGE LAND, LLC, a
Colorado limited liability company,

　　　Plaintiffs - Appellants,

v.

UNITED STATES OF AMERICA;
UNITED STATES FOREST SERVICE, an
agency of the United States Department of
Agriculture,

　　　Defendants - Appellees.

No. 24-1241

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:22-CV-02829-WJM-NRN)**

_____

Steven J. Bushong (Cassidy L. Woodard and Kate A. Bosh, with him on the briefs), of
Bushong & Holleman PC, Boulder, Colorado, for Plaintiffs-Appellants.

Tamara Rountree, Attorney (Todd Kim, Assistant Attorney General, with her on the
brief), United States Department of Justice, Environment and Natural Resources
Division, Washington, D.C., for Defendants-Appellees.

_____

Before **MATHESON**, **EBEL**, and **CARSON**, Circuit Judges.

_____

**EBEL**, Circuit Judge.

_____

In 1991, the predecessor-in-interest to plaintiffs Purgatory Recreation I, LLC and Purgatory Village Land, LLC (together, "Purgatory") conveyed a tract of land to the United States in a land exchange. The predecessor retained ownership of certain water rights that are accessible only through the land conveyed to the federal government, but the conveyance documents did not mention these water rights or provide the predecessor with any right of access over the conveyed land, which is now managed by the United States Forest Service ("USFS"). After years of unsuccessful negotiations with the USFS to secure a permit to access the water rights, Purgatory brought this federal civil action in 2022 against the United States and the USFS under the Quiet Title Act ("QTA"), 28 U.S.C. § 2409a, and Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201, asserting that it has a right of access across the federal land to develop its water rights. The district court granted Defendants' motion to dismiss both claims, concluding the QTA claim was barred by that statute's twelve-year statute of limitations and the DJA claim was, in effect, a quiet title claim that can be brought only under the QTA, so that claim was also barred by the QTA's statute of limitations. Purgatory argues on appeal that the QTA claim did not accrue until 2010, so Purgatory's 2022 suit was timely, and that the DJA claim is distinct from the QTA claim and, therefore, not subject to the QTA's statute of limitations.

We hold the district court correctly concluded the QTA claim was time-barred. By 2006, at the latest, the USFS had asserted exclusive control of the conveyed land sufficient to put Purgatory's predecessor on notice that the USFS did not recognize any right of access to the water rights. Therefore, the QTA's statute of limitations

2

expired in 2003 or, at the latest, 2018, both of which predated the filing of Purgatory's QTA claim. We also conclude Purgatory's DJA claim must be dismissed, albeit on different grounds than those relied upon by the district court. In its DJA claim, Purgatory requests three specific declarations: (1) that it is contrary to Colorado law for USFS to ensure instream flows in the East Fork Hermosa Creek by requiring Purgatory to forfeit its Water Rights; (2) that federal law requires that owners of inholdings (including water rights) on federal land have the ability to use that property, subject to reasonable regulation; and (3) that a complete prohibition on Purgatory's use of the Water Rights would constitute a taking of private property for public use in violation of the Fifth Amendment of the United States Constitution and Article II, section 15 of the Colorado Constitution. We hold that we lack jurisdiction over the first two requests and the third fails for lack of prudential ripeness because Purgatory must first bring a Tucker Act claim for compensation for an alleged taking.

In deciding this case on statute of limitations and jurisdictional grounds, we do not address whether Purgatory would otherwise be entitled to its asserted right of access or whether Defendants have complied with applicable state and federal law. Exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM the district court's dismissal of both claims.

## I.    BACKGROUND

Purgatory owns Purgatory Ski Resort ("Resort") and an affiliated resort community just north of Durango, Colorado. The Resort was originally developed by Raymond T. Duncan and certain related entities he founded, including T-H Land Co.

3

("T-H").  In the 1970s and 1980s, certain conditional water rights on the East Fork of Hermosa Creek ("Water Rights") were decreed pursuant to Colorado law to Duncan and T-H.[1]  The Water Rights at issue in this case are for groundwater within the Hermosa Creek watershed that is accessible by drilling a well.

In 1991, T-H and the United States completed a land exchange ("Land Exchange") in which T-H conveyed certain private land on one side of the Resort to the United States and the United States conveyed certain federal land on the other side to T-H.  Crucially, the land T-H conveyed to the United States contained the areas that had been identified as possible points of diversion (well sites) to access the Water Rights.  Purgatory Recreation I, LLC v. United States, No. 22-CV-2829-WJM-NRN, 2024 WL 1621545, at *1 (D. Colo. Apr. 15, 2024) (unreported).

The terms of the conveyance were memorialized in a land exchange agreement ("Exchange Agreement") and a warranty deed ("Warranty Deed").  Neither document makes any mention of the Water Rights nor access to them.  The Exchange Agreement states that T-H would convey "good title, free from all encumbrances except those set forth in Schedule 'A.'"  (Aplt. App. 27.)  In turn, Schedule A states that the conveyance is subject to "Outstanding Rights" including various rights-of-way and easements, but lists no reservations.  (Id. at 31–32 ("Reservations: None").)  The Warranty Deed conveys title subject to the same Outstanding Rights and with the

---

[1] Under Colorado law, a conditional water right is an undeveloped right that can be perfected by putting the water to beneficial use.  See Colo. Rev. Stat. § 37-92-103(6).

4

same "Reservations: None" language, making no mention of the Water Rights. (Id. at 38–40.)

After the United States acquired the Exchange Lands, they became part of the National Forest System managed by the USFS. In 2001, Purgatory's predecessor-in-interest Durango Mountain Resort ("Durango") submitted a proposal for a special use permit ("SUP") to the USFS to drill two test wells on the Exchange Lands to explore development of the Water Rights.[2] The USFS responded that it would need to conduct a more in-depth environmental analysis and requested more information from Durango to figure out how to proceed.[3]

Between 2003 and 2006, Durango submitted three more SUP proposals. Each time, the USFS responded by requesting more information and explaining that it was

---

[2] A SUP is a permit given by the USFS that authorizes an entity's "use or occupancy of National Forest System lands and specifies the terms and conditions under which the use or occupancy may occur." 36 C.F.R. § 251.51. It is generally required for commercial use of USFS lands, even if the applicant has common law or statutory access rights. See United States v. Jenks, 22 F.3d 1513, 1518 (10th Cir. 1994).

[3] A court "typically consider[s] 'only the contents of the complaint when ruling on a 12(b)(6) motion.' But [a court] also will consider 'documents incorporated by reference in the complaint [and] documents referred to in and central to the complaint, when no party disputes [their] authenticity.'" Goodwill Indus. of Cent. Okla., Inc. v. Philadelphia Indem. Ins. Co., 21 F.4th 704, 709 (10th Cir. 2021) (quoting Berneike v. CitiMortgage, Inc., 708 F.3d 1141, 1146 (10th Cir. 2013)). In its response to Defendants' motion to dismiss, Purgatory objected to the introduction of the letters between Durango and the USFS regarding Durango's SUP proposals because they were "neither incorporated by reference in the Complaint nor 'central to the complaint' as required to attach such documents to a motion to dismiss." Purgatory Recreation, 2024 WL 1621545, at *5 n.6. The district court rejected this argument and considered the letters in deciding the motion to dismiss because the letters were expressly referenced in the complaint and Purgatory did not object to the authenticity of the letters. Id. Purgatory does not challenge that ruling on appeal.

worried Durango's withdrawal of water would jeopardize the long-term survival of the resident Colorado River cutthroat trout, which is a formally designated sensitive species by numerous state and federal entities. Purgatory Recreation, 2024 WL 1621545, at *2. Specifically, the USFS concluded that "[t]here is a definite relationship between stream flow and the quality and quantity of trout habitat in the East Fork Hermosa Creek," and therefore "any actions that could result in lower flows in the East Fork Hermosa Creek represent an unacceptable risk." (Aplt. App. 82.) Though Durango would be directly withdrawing only groundwater, not surface water, the USFS was concerned that the groundwater and surface water of the East Fork of Hermosa Creek are hydrologically connected such that withdrawing groundwater would also decrease the water flowing on the surface. Therefore, the USFS informed Durango that, "[w]ithout scientifically sound hydrologic data that definitively shows no effect to stream flows resulting from the installation of a test well in the desired location, your request to drill a test/exploration well, and subsequent water development in the East Fork is not approved." (Id.)

Noting that "[i]t is Forest Service policy under special uses management to deny proposals that are in conflict with other forest management objectives" (id. at 81), the USFS concluded that, without solid evidence that the proposed wells would not decrease stream flows, "the withdrawal of water in the proposed location is inconsistent, and may conflict with, our management of the water to develop and restore fisheries habitat in the upper East Hermosa drainage" (id. at 90). See 36 C.F.R. § 251.54.

6

In the years since the Land Exchange, Durango had periodically filed applications with the state Water Court to demonstrate reasonable diligence in developing the conditional Water Rights as required by state statute.[4] The USFS did not oppose the first four applications, but in October 2010 (and again in 2012) it opposed them and claimed the Water Rights should be extinguished because "the necessary land use authorization for the structures . . . will not be granted by the Forest Service." (Aplt. App. 17 ¶ 40 (emphasis omitted).) During the proceedings for Durango's 2010 application, the Forest Supervisor for the USFS testified that the USFS would not allow "a single drop of water" to be diverted for the Water Rights. (Id. ¶ 41.)

Purgatory filed the present suit in October 2022, asserting a right to access the Exchange Lands to use its Water Rights.[5] In Claim I, Purgatory seeks to quiet title to an implied easement of necessity under the QTA.[6] In Claim II, Purgatory requests

---

[4] To maintain a conditional water right that has not yet been perfected (meaning the water is not yet being used), the owner must periodically file an application in state Water Court "to demonstrate reasonable diligence in perfecting the rights through beneficial use." See Colo. Rev. Stat. § 37-92-301(4)(a)(I).

[5] Sometime between 2013 and 2016, Purgatory acquired its interest in the Resort from Durango.

[6] "An implied easement of necessity for access to land arises when the owner of a tract of land conveys part of that tract to another, leaving either the part conveyed or the part retained without access except over the other part." Thompson v. Whinnery, 895 P.2d 537, 540 (Colo. 1995). To establish an implied easement of necessity in Colorado, three requirements must be met: "(1) there must be unity of ownership of the entire tract prior to division; (2) the necessity for the easement must exist at the time of severance; and (3) the necessity for the particular easement must be great." Id. The merits of Purgatory's claim for an easement of necessity are not at issue in this appeal.

three declaratory judgments under the DJA establishing that it has a right to access the Exchange Lands to develop its Water Rights and that Defendants' denial of access violates various state and federal laws.

Defendants filed a motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), which the district court granted. Purgatory Recreation, 2024 WL 1621545, at *1–3. The court held that Purgatory's QTA claim accrued at the time of the Land Exchange in 1991 and was, therefore, untimely under the QTA's twelve-year statute of limitations. Id. at *5. It also concluded that, even if the Land Exchange itself was not sufficient to begin the running of the statute of limitations, the USFS's responses to the SUP proposals between 2001 and 2007 were sufficient because they put "Purgatory on notice well before 2010 that the Forest Service believed it had the authority and right to deny access to the water rights." Id. Finally, the court concluded that Purgatory's requests for declaratory judgments were also time-barred because they are all linked to the question of a title right of access and the QTA is the exclusive remedy for such claims. Id. at *7; see Block v. N.D. ex rel. Bd. of Univ. & Sch. Lands, 461 U.S. 273, 286 (1983) (holding that the QTA is "the exclusive means by which adverse claimants [may] challenge the United States' title to real property."). The court also noted that Purgatory had failed to plead any waiver of sovereign immunity for the DJA claim other than the QTA's waiver. Purgatory Recreation, 2024 WL 1621545, at *7.

Purgatory timely appealed the district court's dismissal of its claims.

8

## II.     STANDARD OF REVIEW

We review de novo a district court's grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).[7]  Johnson v. Reyna, 57 F.4th 769, 774 (10th Cir. 2023).  In doing so, "[w]e accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to [Purgatory], the non-moving party."  Id.  "To survive a motion to dismiss, a complaint must include 'enough facts to state a claim to relief that is plausible on its face.'"  Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim is plausible on its face 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  Id. at 774–75 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "Whether a court properly applied a statute of limitations and the date a statute of limitations accrues under undisputed facts are questions of law we review de novo." Nelson v. State Farm Mut. Auto. Ins. Co., 419 F.3d 1117, 1119 (10th Cir. 2005).

## III.     DISCUSSION

Purgatory brings two claims, one under the QTA and one under the DJA.  We first conclude the district court properly dismissed Purgatory's QTA claim because

---

[7] Purgatory notes on appeal that the district court did not clarify whether it was dismissing under Rule 12(b)(6) or Rule 12(b)(1).  However, it appears clear that the district court dismissed under Rule 12(b)(6) because it expressly recognized that the Supreme Court held the QTA's statute of limitations is nonjurisdictional.  Purgatory Recreation, 2024 WL 1621545, at *4 n.5 (citing Wilkins v. United States, 598 U.S. 152, 155 (2023)).  Accordingly, we review the district court's dismissal under the standards applicable to a Rule 12(b)(6) dismissal.

9

Purgatory failed to bring it within the QTA's twelve-year statute of limitations. We then go on to address why each of Purgatory's three requests for declaratory relief must also be dismissed, albeit on slightly different grounds than those relied upon by the district court.

### A. Purgatory's QTA claim is barred by that act's twelve-year statute of limitations

In Claim I, Purgatory requests an implied easement of necessity across the Exchange Lands now owned by the United States and managed by the USFS in order to access well sites to develop its Water Rights. We conclude that this claim accrued, at the latest, in 2006 when the USFS made clear to Purgatory's predecessor-in-interest Durango that it did not recognize any existing right of access for Durango. Therefore, the QTA's twelve-year statute of limitations had already expired when Purgatory brought this suit in 2022 and the district court correctly dismissed it as time-barred.

### 1. Legal standard for QTA claim accrual

The QTA allows a plaintiff to bring a suit seeking "to adjudicate a disputed title to real property in which the United States claims an interest." 28 U.S.C. § 2409a(a). The act extends beyond just disputes over fee simple ownership of property, applying to "suit[s] by a plaintiff asserting a 'right, title, or interest' in real property that conflicts with a 'right, title, or interest' the United States claims." Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. 209, 215 (2012) (quoting 28 U.S.C. § 2409a(d)); see also 28 U.S.C. § 1346(f) (granting

district courts "exclusive original jurisdiction of civil actions under section 2409a to quiet title to an estate or interest in real property in which an interest is claimed by the United States").  Relevant here, "[e]asements are real property interests subject to quiet title actions."  Kinscherff v. United States, 586 F.2d 159, 161 (10th Cir. 1978).

The QTA has a twelve-year statute of limitations.[8]  28 U.S.C. § 2409a(g).  The statute provides that a QTA claim "shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States."  Id.  The test for whether a plaintiff "should have known" of the government's claim is one of reasonableness: "Only if it was unreasonable for the [plaintiff] to have failed to discover the claim of the United States should the limitations provision . . . become operative."  Amoco Prod. Co. v. United States, 619 F.2d 1383, 1388 (10th Cir. 1980).

"[T]he trigger for starting the QTA limitations period is 'an exceedingly light one.'"  Kane Cnty., 772 F.3d at 1215 (quoting George v. United States, 672 F.3d 942, 944 (10th Cir. 2012)).  "The limitations period isn't triggered only when the government acts to enforce its claim . . . .  [B]y its plain terms the QTA['s limitations

---

[8] The Supreme Court recently held that the QTA's statute of limitations is a nonjurisdictional claims-processing rule.  Wilkins, 598 U.S. at 155.  This abrogated prior precedent from this court, which, along with several other circuits, had held the statute of limitations was jurisdictional.  Id. at 156 n.2; see Kane Cnty. v. United States, 772 F.3d 1205, 1215 (10th Cir. 2014).  Despite the QTA's statute of limitations being nonjurisdictional, equitable tolling of the statute of limitations is not available.  United States v. Beggerly, 524 U.S. 38, 48–49 (1998); see Wilkins, 598 U.S. at 164.  The Beggerly Court reasoned that the twelve-year statute of limitations for QTA claims is already "unusually generous."  Beggerly, 524 U.S. at 48–49.

11

period] is triggered by the government's <u>claim</u>— by its <u>assertion</u> of 'some interest adverse' to the plaintiff or [its] predecessor." <u>George</u>, 672 F.3d at 946 (quoting <u>Knapp v. United States</u>, 636 F.2d 279, 283 (10th Cir. 1980)) (emphasis in original). "[O]ur precedent does not allow plaintiffs to wait until the adverse claims of title asserted by them and the United States crystallize into well-defined and open disagreements before commencing a quiet-title action." <u>Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation</u>, 599 F.3d 1165, 1188 (10th Cir. 2010).

When a plaintiff asserts <u>fee simple</u> ownership of land, its knowledge of the government's competing claim to ownership of that land is sufficient to start the statute of limitations running. "But when the plaintiff claims a non-possessory interest such as an easement, knowledge of a government claim of ownership may be entirely consistent with a plaintiff's claim." <u>Michel v. United States</u>, 65 F.3d 130, 132 (9th Cir. 1995); <u>accord</u> <u>George</u>, 672 F.3d at 947 ("[A] government's claim of title to land isn't always and inherently inconsistent with private ownership of an easement over that land. Easements and servient estates can (and usually do) peaceably coexist."). Therefore, for the government's claim to be adverse to a plaintiff's claim of a non-possessory interest, "the determinative issue is whether the [government action] amounted to a claim of exclusive control or whether it permitted the United States' ownership interest and the Plaintiffs' right-of-way to 'peaceably coexist.'" <u>Kane Cnty.</u>, 772 F.3d at 1217 (quoting <u>George</u>, 672 F.3d at 947).

12

## 2. Purgatory's QTA claim is barred by that act's twelve-year statute of limitations

Applying these principles in this case, the statute of limitations on Purgatory's QTA claim began to run, at the latest, in 2006, which means it had already expired before this suit was brought.

There are three events raised by the parties as possible triggers for the statute of limitations to start running on Purgatory's QTA claim. First, Defendants argue the statute of limitations on Purgatory's claim began to run at the time of the Land Exchange in 1991 because, at that time, Purgatory's predecessor-in-interest T-H was on notice that the United States claimed unencumbered—that is, free of any easement for access to the Water Rights—fee simple ownership of the land in which Purgatory now asserts an easement. Second, Defendants argue that, if the statute of limitations did not begin to run in 1991, then it at least began to run by 2006 because the USFS had clearly asserted a claim of exclusive control in its responses to Durango's four SUP proposals between 2001 and 2006. By contrast, Purgatory argues the statute of limitations did not begin to run until October 30, 2010, when, according to Purgatory, the USFS first asserted exclusive control over the Exchange Lands by arguing in Colorado Water Court that the Water Rights should be extinguished because "the necessary land use authorization for the structures . . . will not be granted by the Forest Service." (Aplt. App. 16–17 ¶ 40 (emphasis omitted).) Thus, Purgatory asserts its suit brought on October 27, 2022, was filed before the twelve-year statute of limitations expired.

13

The district court concluded that Purgatory's claim accrued at the time of the Land Exchange in 1991. Purgatory Recreation, 2024 WL 1621545, at *5. It explained that neither the Exchange Agreement nor the Warranty Deed mention the Water Rights or access to them. Since the Warranty Deed was properly recorded, this provided constructive notice of the United States' claim to title of the Exchange Land free from the encumbrance of any easement held by Purgatory and its predecessors. Id.; see Amoco, 619 F.2d at 1387–88 (holding that proper recording provides constructive notice satisfying the "should have known" language of § 2409a(g)).

We disagree with the district court's reasoning. While the district court was correct that a recorded deed provides constructive notice of a property interest, the recorded interest must actually conflict with the plaintiff's asserted interest to start the statute of limitations running on a potential QTA claim. See Kane Cnty., 772 F.3d at 1217. Here, the recorded Warranty Deed did not necessarily conflict with Purgatory's asserted implied easement. The fact that the United States had fee simple title free from an express easement for Purgatory and its predecessors to access the Water Rights does not automatically provide notice that the United States also claimed ownership of the Exchange Land free from any implied easements. An implied easement, as its characterization suggests, is an easement that is implied rather than an easement that is expressly set forth in a title document. See Kinscherff, 586 F.2d at 161 (explaining that, when a plaintiff asserts an implied easement of necessity over government land, the relevant question is when the

14

plaintiff or its predecessors "knew or should have known of the Government's <u>claim of no easement or of a limited easement</u>" (emphasis added)).  In <u>George</u>, this court cited two Ninth Circuit cases to reject the notion that mere clean title can be understood to disclaim any implied right of access over government land:

> In <u>Michel</u>, the government went so far as to assert that its mere claim of title to the land was enough to start the limitations clock running.  65 F.3d at 131. But, as the Ninth Circuit held in [<u>Michel</u> and <u>McFarland v. Norton</u>, 425 F.3d 724 (9th Cir. 2005)] and we agree, a government's claim of title to land isn't always and inherently inconsistent with private ownership of an easement over that land.

<u>George</u>, 672 F.3d at 947; <u>accord</u> <u>Werner v. United States</u>, 9 F.3d 1514, 1516–18 (11th Cir. 1993).  While Purgatory and its predecessors knew the United States claimed express unencumbered title to the Exchange Land, they had no reason to know at the time of the conveyance that the United States also disputed the existence of an implied easement.

Defendants argue that the particular language used in the conveyance documents (the Exchange Agreement and Warranty Deed) was sufficient to put Purgatory and its predecessors on notice that Defendants disputed the existence of any adverse right of access to the Water Rights.  They note that Purgatory's predecessor agreed to "convey good title, free from all encumbrances except those" mentioned in the two documents (Aplt. App. 27), and those documents specifically

15

stated there were no reservations retained by the grantor (id. at 32, 38 ("Reservations: None")).[9]

We agree that the language used in conveyance documents is relevant to our inquiry into whether a party had notice of an adverse interest, and that these documents clearly establish that Purgatory and its predecessors did not retain any express easement. However, we do not think the generic no reservations language was sufficient to put Purgatory or its predecessors on notice that the government would dispute the existence of an implied right of access to the Water Rights, and certainly not an implied easement that accrued only upon severance of the Water Rights from the surrounding land. See Patterson v. Buffalo Nat'l River, 76 F.3d 221, 225 (8th Cir. 1996) (explaining that an implied easement by necessity is "created upon severance of ownership" and cannot have existed prior to that severance); see also Couch v. Avila Aguilar, 631 S.W.3d 898, 906 (Tex. App. 2021) (holding plaintiff was entitled to an implied easement of necessity despite the relevant deed stating "Reservations From and Exceptions to Conveyance and Warranty": "None").[10]

---

[9] The documents also referred to various "Outstanding Rights" held by other entities not party to the Land Exchange. Any right of access retained by Purgatory and its predecessors would not have been listed as an "outstanding right" because that term generally refers only to rights held by nonparties to the transaction. See 36 C.F.R. § 254.2 ("Outstanding interests are rights or interests in property held by an entity other than a party to an exchange.").

[10] Furthermore, as will be discussed below, in Claim II Purgatory asserts a statutory right of access under the Alaska National Interest Lands Conservations Act of 1980 (ANILCA) separate from its asserted implied easement of necessity. See 16 U.S.C. § 3210(a) ("[T]he Secretary shall provide such access to nonfederally owned

Regardless of whether Purgatory's QTA claim accrued at the time of the Land Exchange itself, the district court also concluded the claim accrued, at the latest, by 2006 as a result of the USFS's communications to Durango in response to Durango's SUP proposals. Purgatory Recreation, 2024 WL 1621545, at *5. We agree.

Purgatory's predecessor-in-interest Durango submitted four SUP proposals between 2001 and 2007. Id. Although the USFS's responses were generally framed as requests for more information, they also indicated that the USFS believed it had the authority to deny the requests altogether if use of the Water Rights would decrease stream flows. For instance, the USFS stated the following:

- 2003: "any actions that could result in lower flows in the East Fork Hermosa Creek represent an <u>unacceptable risk</u>. Without scientifically sound hydrologic data that definitively shows no effect to stream flows . . . , your request . . . is <u>not approved</u>" (Aplt. App. 82 (emphasis added));

- 2003: "[i]t is Forest Service policy under special uses management to <u>deny proposals</u> that are in conflict with other forest management objectives" (id. at 81 (emphasis added));

- 2006: "we believe that <u>the withdrawal of water in the proposed location is inconsistent, and may conflict with, our management of the water</u> to develop and restore fisheries habitat in the upper East Hermosa drainage" (id. at 90 (emphasis added)).

---

land within the boundaries of the National Forest System as the Secretary deems adequate to secure to the owner the reasonable use and enjoyment thereof."). Thus, if the Exchange Agreement and Warranty Deed could be read to provide notice that the government disputed the existence of any implied easement of necessity, this would not necessarily also provide notice that the government was denying Purgatory its statutory right of access. The documents say nothing about statutory rights. Therefore, the statute of limitations for Purgatory's statutory claim, which we conclude below belongs under the QTA, did not start running at the time of the Land Exchange and we must look to later events to determine when that claim accrued.

17

These statements demonstrate that the USFS believed it had the authority to deny Durango's use of the Water Rights entirely, which is an assertion of exclusive control that would put a reasonable person in Durango's position on notice that the USFS was asserting an interest adverse to its, and later, Purgatory's, claimed easement.

In arguing against this conclusion, Purgatory emphasizes the fact that, until 2010, the USFS never actually <u>rejected</u> the proposals and, instead, continued to communicate and meet with Purgatory's predecessor to facilitate development of the Water Rights. Purgatory argues these communications demonstrated only that the USFS sought to regulate Purgatory's access rights—which is not inconsistent with Purgatory's asserted easement—and did not indicate that the USFS disputed the existence of an implied easement. In support of this argument, Purgatory relies on the "peaceable coexistence" language we used in <u>Kane County</u> and other cases. <u>See</u> <u>Kane Cnty.</u>, 772 F.3d at 1217 ("[T]he determinative issue is whether the [federal action] amounted to a claim of exclusive control or whether it permitted the United States' ownership interest and the Plaintiffs' right-of-way to 'peaceably coexist.'" (quoting <u>George</u>, 672 F.3d at 947)); <u>see also</u> <u>San Juan Cnty. v. United States</u>, 754 F.3d 787, 794 (10th Cir. 2014). Purgatory argues the ongoing SUP negotiations between its predecessor and the USFS prior to 2010 demonstrated that a "peaceable coexistence" was still possible, and therefore Purgatory was not on notice that the USFS disputed the existence of Purgatory's asserted easement.

But Purgatory misunderstands the relevance of a "peaceable coexistence": the mere possibility of a gratuitous peaceable coexistence—in this case, Purgatory

18

receiving a SUP—is not inconsistent with the government claiming exclusive control. Exclusive control does not mean that no access will be granted, it just means that the USFS has the exclusive right to control access and is under no obligation to ensure Purgatory has reasonable use and enjoyment of the Water Rights. See George, 672 F.3d at 946 ("The limitations period isn't triggered only when the government acts to enforce its claim . . . ."). The fact that the USFS left open the possibility of the Water Rights being developed if doing so would not decrease surface stream flows does not preclude it from also having exclusive control over access that can be enforced anytime the USFS chooses not to allow Purgatory's requested access.

Purgatory is correct that the USFS's exercise of regulatory authority over Purgatory's access to the Water Rights (i.e., requiring a SUP) does not automatically mean the USFS is asserting exclusive control that is adverse to Purgatory's asserted easement. But the possibility that the USFS might grant a SUP also does not mean that the USFS accepts Purgatory's asserted easement. The availability of a SUP is not restricted to entities with preexisting legal rights of access, so the USFS's willingness to negotiate with Purgatory over access says little about whether it recognizes Purgatory's asserted easement or whether, instead, it denies the existence of any easement and believes it has exclusive control, even if it might voluntarily decide to grant Purgatory access at some point.

Our prior cases referring to a "peaceable coexistence" are factually distinguishable from this case: those cases addressed a situation in which the plaintiff's asserted right of way was already in use as a right of way. See Kane

19

Cnty., 772 F.3d at 1218; San Juan Cnty., 754 F.3d at 794; McFarland, 425 F.3d at 727–28. Thus, there was reason to doubt that a reasonable plaintiff would be on notice that the United States asserted exclusive control when the United States continued to allow access. See San Juan Cnty., 754 F.3d at 794. In contrast, in this case Purgatory and its predecessors have never had access to the sites needed to develop the Water Rights since the Land Exchange. Simply stated, there has never been any "peaceable coexistence."

The ultimate question is whether Purgatory or its predecessors were on notice that the USFS asserted a claim adverse to Purgatory's asserted implied easement. Since Purgatory would be entitled to the reasonable use and enjoyment of its Water Rights if it had an easement, the USFS's assertion of authority to deny use of the Water Rights entirely, or to allow such use only on whatever terms the USFS should choose, is inconsistent with, and adverse to, Purgatory's claimed legal right to an easement. Therefore, the USFS's communications to Purgatory's predecessor-in-interest between 2003 and 2006 evinced an assertion of exclusive control sufficient to put Purgatory on notice that the USFS denied the existence of Purgatory's alleged easement. The twelve-year statute of limitations on Purgatory's QTA claim expired, at the latest, in 2018, and this claim brought in 2022 is time-barred.[11]

---

[11] Purgatory also argues on appeal that the district court improperly weighed the evidence and drew inferences against Purgatory, which is not allowed when deciding a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss. See Sutton v. Utah State Sch. for Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir. 1999). Purgatory specifically cites as error the district court's conclusions that (1) the no-reservations language in the Exchange Agreement and Warranty Deed was by itself sufficient to

## B. Purgatory's DJA claim must also be dismissed

In Claim II, Purgatory requests declaratory judgments related to its right to access the Water Rights and the USFS's obligations with respect to those Water Rights under state and federal law. Relevant in this appeal, Purgatory requests three specific declarations: (1) it is contrary to Colorado law for USFS to ensure instream flows in the East Fork Hermosa Creek by requiring Purgatory to forfeit its Water Rights; (2) federal law requires that owners of inholdings (including water rights) on federal land have the ability to use that property, subject to reasonable regulation; and (3) a complete prohibition on Purgatory's use of the Water Rights would constitute a taking of private property for public use in violation of the Fifth Amendment of the United States Constitution and Article II, section 15 of the Colorado Constitution.[12]

---

put Purgatory on notice that the USFS disputed its asserted easement, and (2) the USFS's communications between 2003 and 2006 created "at the very least some ambiguity concerning the SUP requests in Plaintiffs' minds." (Aplt. Br. 20–21 (quoting Aplt. App. 141).) While we disagree with the district court's conclusion with respect to the legal effect of the Exchange Agreement and the Warranty Deed, the district court did not improperly weigh the evidence in making these conclusions. Rather, the district court simply applied the undisputed facts (the text of the conveyance documents and the correspondence between the USFS and Purgatory's predecessor) to the relevant case law to determine the legal effect of those facts. See Nelson, 419 F.3d at 1119 ("[T]he date a statute of limitations accrues under undisputed facts [is a] question[] of law . . . .").

[12] In its complaint, Purgatory additionally requested a fourth declaration that "Purgatory has a legal right to access . . . [its] Water Rights . . . subject only to reasonable regulation by the USFS that does not prohibit the exercise of Purgatory's vested rights." (Aplt. App. 24 ¶ 69(a).) However, Purgatory appears to acknowledge that this request belongs under the QTA and advances only the above three declaratory-judgment requests on appeal. Therefore, we consider any arguments related to that fourth request to be waived. See Burke v. Regalado, 935 F.3d 960,

We conclude that these requests must be dismissed, each for a different reason. The district court concluded that each of the requests is, in effect, a request to quiet title that must be brought under the QTA. Purgatory Recreation, 2024 WL 1621545, at *7.[13] We agree with the district court that the second request belongs under the QTA and, therefore, it must be dismissed for lack of subject-matter jurisdiction. However, we conclude we lack subject-matter jurisdiction over the first request because it does not arise under federal law, and the third request must be dismissed for lack of prudential ripeness.[14] See Elkins v. Comfort, 392 F.3d 1159, 1162 (10th Cir. 2004) ("We have discretion to affirm on any ground adequately supported by the record."). We first outline the Declaratory Judgment Act before addressing a

_____

1014 (10th Cir. 2019) ("Issues not raised in the opening brief are deemed abandoned or waived." (quotation marks omitted)).

[13] As noted above, the district court was not clear about whether it was dismissing pursuant to Rule 12(b)(6) for failure to state a claim or pursuant to Rule 12(b)(1) for lack of jurisdiction. Because the court properly understood that the QTA's statute of limitations is nonjurisdictional and dismissed Claim II (the DJA requests) as being "time-barred," we read it as dismissing that claim, like the QTA claim, pursuant to Rule 12(b)(6). However, we have previously established that when a claim properly belonging under the QTA is brought under another statute, the court lacks jurisdiction to hear it under that other statute. See Navajo Tribe of Indians v. New Mexico, 809 F.2d 1455, 1468–69 (10th Cir. 1987). Therefore, when a claim belonging under the QTA is brought under another statute, the proper procedure is to dismiss the claim under Rule 12(b)(1) for lack of jurisdiction.

[14] Because we dismiss Purgatory's first request on jurisdictional grounds, we decline to also address whether that request belongs under the QTA. See Sinochem Int'l Co. v. Malay. Int'l Shipping Corp., 549 U.S. 422, 431 (2007) (explaining "that a federal court has leeway 'to choose among threshold grounds for denying audience to a case on the merits'" because "there is no mandatory 'sequencing of jurisdictional issues'" (quoting Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 584–85 (1999))).

22

threshold issue of sovereign immunity and then turning to our resolution of each of the three requests in turn.

### 1. The Declaratory Judgment Act

The Declaratory Judgment Act provides:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a). As its text suggests, the DJA "does not confer jurisdiction upon federal courts . . . , so the power to issue declaratory judgments must lie in some independent basis of jurisdiction." Cardtoons, L.C. v. Major League Baseball Players Ass'n, 95 F.3d 959, 964 (10th Cir. 1996). Nor does the DJA provide a waiver of sovereign immunity. Z St., Inc. v. Koskinen, 44 F. Supp. 3d 48, 63 (D.D.C. 2014), aff'd sub nom. Z St. v. Koskinen, 791 F.3d 24 (D.C. Cir. 2015); see Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671 (1950) ("The operation of the Declaratory Judgment Act is procedural only." (quoting Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240 (1937)).

Purgatory relies on federal question jurisdiction as the basis for each of its requests under the DJA. Federal question jurisdiction exists for "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. "A case arises under federal law if its 'well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law.'"

Nicodemus v. Union Pac. Corp., 440 F.3d 1227, 1232 (10th Cir. 2006) (quoting

Morris v. City of Hobart, 39 F.3d 1105, 1111 (10th Cir. 1994), in turn quoting

Franchise Tax Bd. v. Constr. Laborers Vacation Tr., 463 U.S. 1, 27–28 (1983)).

### 2. Section 702 of the APA provides a waiver of sovereign immunity

We first address whether Purgatory has properly identified a waiver of

sovereign immunity for its DJA claim asserted against the United States and the

USFS.  See F.D.I.C. v. Meyer, 510 U.S. 471, 475 (1994) ("Absent a waiver,

sovereign immunity shields the Federal Government and its agencies from suit.").

Purgatory asserts that the waiver of sovereign immunity in § 702 of the

Administrative Procedure Act ("APA") applies to its DJA claim.  Section 702

provides, in relevant part:

> An action in a court of the United States seeking relief other than money
> damages and stating a claim that an agency or an officer or employee thereof
> acted or failed to act in an official capacity or under color of legal authority
> shall not be dismissed nor relief therein be denied on the ground that it is
> against the United States or that the United States is an indispensable
> party. . . .  Nothing herein . . . confers authority to grant relief if any other
> statute that grants consent to suit expressly or impliedly forbids the relief
> which is sought.

5 U.S.C. § 702.  Crucially, "[t]his waiver is not limited to suits under the [APA]."

Simmat v. U.S. Bureau of Prisons, 413 F.3d 1225, 1233 (10th Cir. 2005), abrogated

on other grounds by Jones v. Bock, 549 U.S. 199, 216 (2007).  Therefore, Purgatory

argues that § 702 waives the government's sovereign immunity for Purgatory's

requests for declaratory relief because Purgatory claims the USFS "acted or failed to

act . . . under the color of legal authority" by prohibiting access to the Water Rights.

(Aplt. Reply Br. 15.) We agree, and Defendants do not seriously dispute this reasoning.[15]

The problem is that Purgatory failed to mention § 702 in its Complaint and did not mention any basis for a waiver of sovereign immunity for its DJA claim until raising § 702 in its brief in opposition to Defendants' motion to dismiss. Thus, in dismissing Purgatory's DJA claim, the district court concluded Purgatory had "fail[ed] to sufficiently plead a . . . waiver of sovereign immunity [separate from the QTA's waiver]." Purgatory Recreation, 2024 WL 1621545, at *7. Defendants argue on appeal that the district court was correct not to address Purgatory's belated assertion of a waiver under § 702 and that Purgatory forfeited any claims that rely on § 702's waiver.

Defendants are correct in asserting that, because sovereign immunity is jurisdictional in nature, a plaintiff bringing a claim against the United States must plead an applicable waiver of sovereign immunity to establish the court's subject-matter jurisdiction. See United States ex rel. Gen. Rock & Sand Corp. v. Chuska

---

[15] Defendants do point out that the waiver of sovereign immunity in § 702 does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. They thus suggest the waiver does not apply to Purgatory's request for declaratory relief based on a takings claim because the Tucker Act, which allows a plaintiff to bring a claim for monetary compensation for violations of the Takings Clause, impliedly forbids declaratory relief for takings claims. However, we have previously rejected this argument. See Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d 1290, 1299 (10th Cir. 2009) (explaining that the Tucker Act impliedly forbids declaratory and injunctive relief for contract claims, but not for claims founded on the federal Constitution, statutes, or regulations). Therefore, the waiver of sovereign immunity in § 702 applies to Purgatory's request for declaratory relief for an alleged taking.

Dev. Corp., 55 F.3d 1491, 1495 (10th Cir. 1995) ("The party seeking the exercise of jurisdiction in his favor must allege in his pleading the facts essential to show jurisdiction." (quoting Penteco Corp. v. Union Gas Sys., Inc., 929 F.2d 1519, 1521 (10th Cir. 1991) (further quotation marks omitted)); Pueblo of Jemez v. United States, 790 F.3d 1143, 1151 (10th Cir. 2015) ("[A] party seeking to assert a claim against the government . . . must also point to a specific waiver of immunity in order to establish jurisdiction." (quoting Normandy Apartments, 554 F.3d at 1295)).

However, Purgatory's failure to plead a waiver of sovereign immunity under § 702 need not be fatal for its DJA claim. By federal statute, "[d]efective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts." 28 U.S.C. § 1653. Because it is clear that § 702 provides a waiver of sovereign immunity for Purgatory's DJA claim, we exercise our discretion under § 1653, McKay v. United States, 516 F.3d 848, 852 n.5 (10th Cir. 2008), and decline to dismiss the claim on the grounds that Purgatory failed to properly plead this waiver. See Martinez v. U.S. Olympic Comm., 802 F.2d 1275, 1280 (10th Cir. 1986) (explaining that "[w]hile [certain jurisdictional] allegations should have appeared in Martinez' complaint, for purposes of this appeal we may treat the complaint as having been amended to include them" (citing 28 U.S.C. § 1653)).

### 3. Each of Purgatory's three declaratory judgment requests must be dismissed

#### a. Request 1: for a declaration that it is contrary to Colorado law for USFS to procure instream flows by requiring Purgatory to forfeit its Water Rights

Purgatory first requests a declaration that "it is contrary to Colorado law and federal law for the USFS to require a complete forfeiture of vested water rights, especially where the purpose is to improve instream flows, without adherence to Colorado's prior appropriation doctrine or without appropriating reserved rights if they exist." (Aplt. App. 25 ¶ 69(c).)  Specifically, Purgatory asserts that, under Colorado law, only the Colorado Water Conservation Board is allowed to reserve water for instream flows and, therefore, the USFS's refusal to allow access to Purgatory's Water Rights amounts to an impermissible reservation of water for instream flows without going through the state water appropriation process.[16]  We conclude this request based on state law does not arise under federal law, so the district court lacked subject-matter jurisdiction over it.

---

[16] The relevant Colorado law provides:

[T]he Colorado water conservation board is hereby vested with the exclusive authority . . . to appropriate [water] . . . for minimum streamflows . . . to preserve the natural environment to a reasonable degree.  In the adjudication of water rights pursuant to this article and other applicable law, no other person or entity shall be granted a decree adjudicating a right to water or interests in water for instream flows in a stream channel between specific points, or for natural surface water levels or volumes for natural lakes, for any purpose whatsoever.

Colo. Rev. Stat. § 37-92-102(3) (emphasis added).

As the basis for federal question jurisdiction, Purgatory asserts that this request arises under the federal McCarran Amendment, which provides:

Consent is given to join the United States as a defendant in any suit (1) for the adjudication of rights to the use of water of a river system or other source, or (2) for the administration of such rights, where it appears that the United States is the owner of or is in the process of acquiring water rights by appropriation under State law, by purchase, by exchange, or otherwise, and the United States is a necessary party to such suit.

43 U.S.C. § 666(a).

However, the McCarran Amendment "is limited to suits involving the comprehensive adjudication or administration of all rights in a water system" and cannot be used to determine rights solely between an individual claimant and the United States. Fent v. Okla. Water Res. Bd., 235 F.3d 553, 555 (10th Cir. 2000); see Dugan v. Rank, 372 U.S. 609, 618 (1963) (rejecting application of the McCarran Amendment to "a private suit to determine water rights solely between the respondents and the United States"); Gardner v. Stager, 103 F.3d 886, 888 (9th Cir. 1996) ("The McCarran Amendment does not authorize private suits to adjudicate water rights between particular claimants and the United States.").

Accordingly, we are not persuaded that the McCarran Amendment applies to Purgatory's request. Purgatory makes no argument as to how their request involves a "comprehensive adjudication or administration of all rights in a water system." Fent, 235 F.3d at 555; see Habecker v. Town of Estes Park, 518 F.3d 1217, 1223 (10th Cir. 2008) ("As the party seeking to invoke the jurisdiction of the federal courts, [Purgatory] bears the burden of alleging facts that support jurisdiction."); Perry v.

28

Woodward, 199 F.3d 1126, 1141 n.13 (10th Cir. 1999) ("This court . . . will not craft

a party's arguments for him.").  Indeed, when presented with Defendants' assertion

that the McCarran Amendment does not apply to this request, Purgatory appears to

agree.  In its Reply Brief, Purgatory states that "the subject matter of the DJA claim

is not 'the adjudication' or 'the administration' of water rights as described in the

McCarran Amendment" and asserts that "this dispute [is] not proper . . . under the

McCarran Amendment."  (Aplt. Reply Br. 16.)  Therefore, we cannot conclude that

Purgatory's first declaratory judgment request arises under the McCarran

Amendment.  Because Purgatory fails to establish subject-matter jurisdiction over

that request, it must be dismissed.

### b. Request 2: for a declaration that it is contrary to federal law for the USFS to prohibit Purgatory's access to the Water Rights

Purgatory next requests a declaration that "it is contrary to Colorado and

federal law to prohibit any and all access to, and diversion of, the prior vested . . .

Water Rights."[17]  (Aplt. App. 25 ¶ 69(b).)  Specifically, Purgatory argues that

§ 3210(a) of the Alaska National Interest Lands Conservations Act of 1980

(ANILCA) "requires that the owner of inholdings on federal land have the ability to

---

[17] Though Purgatory references "Colorado law" in this request, the request is primarily based on federal law.  To the extent it is based on state law, it suffers from the same jurisdictional flaw as Purgatory's first requested declaratory judgment: it does not arise under the U.S. Constitution or any federal law or treaty, so there is no federal question jurisdiction, which is the only basis for jurisdiction asserted by Purgatory.

use that property."[18] (Aplt. Br. 22.) The district court concluded this request was inextricably linked to the question of title over access to the Water Rights and, therefore, belonged under the QTA. We agree.

The QTA is "the exclusive means by which adverse claimants [may] challenge the United States' title to real property." Block, 461 U.S. at 286. This means that if a claim falls within the purview of the QTA, then it cannot be brought under another statute. See Rosette, Inc. v. United States, 141 F.3d 1394, 1396–97 (10th Cir. 1998); Rio Grande, 599 F.3d at 1177 n.4 (explaining that requests for declaratory relief that lead "directly back to the question of title and, as such, [are] inextricably linked to that question" must be brought under the QTA (quoting Rosette, 141 F.3d at 1396)). The QTA "applies to claims against the United States for rights of access, easements, and rights-of-way, as well as those involving fee simple interests." Mills v. United States, 742 F.3d 400, 405 (9th Cir. 2014); see Kinscherff, 586 F.2d at 161 ("Easements are real property interests subject to quiet title actions."). Therefore, a request for a declaration as to entitlement to an easement or right of access over federal land falls within the purview of the QTA.

---

[18] Despite the name of the act, "§ 3210(a) of ANILCA applies to all National Forest System lands, not just those in Alaska." Jenks, 22 F.3d at 1516 n.3. An ANILCA claim can be asserted under the APA, see Peper v. U,S. Dep't of Agric., 478 F. App'x 515, 520 (10th Cir. 2012) (unpublished), and is, thus, subject to the APA's sovereign immunity waiver in 5 U.S.C. § 702. We exercise our discretion under 28 U.S.C. § 1653 to amend Purgatory's complaint to include the APA's waiver of sovereign immunity as to their ANILCA claim.

Section 3210(a) of ANILCA provides that "the Secretary shall provide such access to nonfederally owned land within the boundaries of the National Forest System as the Secretary deems adequate to secure to the owner the reasonable use and enjoyment thereof." 16 U.S.C. § 3210(a); see also Jenks, 22 F.3d at 1516 ("Section 3210(a) of ANILCA guarantees to inholders a threshold right of access to their lands subject to reasonable regulation." (cleaned up)). Purgatory argues ANILCA grants it a statutory right of access to its Water Rights within the boundaries of the National Forest System.

But Purgatory's request for a declaration that it is contrary to ANILCA for the USFS to deny access to the Water Rights is simply a request for a statutory easement. As with Purgatory's assertion of an implied easement of necessity, this constitutes a claim to a property right in which the government asserts an adverse interest, and such a claim must be brought under the QTA. See Grill v. United States, No. 21-17098, 2024 WL 5182631, at *2 (9th Cir. Dec. 20, 2024) (unpublished) ("An easement pursuant to an ANILCA right of access is an interest in real property that can support a QTA action."). Purgatory argues that its request focuses on its undisputed ownership of the Water Rights, not access, and "the unlawfulness of USFS actions regarding those water rights." (Aplt. Reply Br. 12.) But the only unlawfulness alleged by Purgatory is that the USFS is denying access. Therefore, this request is "inextricably linked to the question" of whether Purgatory has a right

31

of access.  Such a claim belongs under the QTA, so we lack jurisdiction to consider it under the DJA.[19]

### c. Request 3: for a declaration that denial of access would constitute a taking of Purgatory's Water Rights in violation of the United States and Colorado constitutions

Third, Purgatory requests a declaration that "[a] prohibition of all use of the . . . Water Rights . . . would be a taking of private property for a public use subject to the 5th Amendment of the United States Constitution and Art. II § 15 of the Colorado Constitution."  (Aplt. App. 25 ¶ 69(d).)  We conclude that this request must be dismissed for lack of prudential ripeness because Purgatory must first avail itself of the procedure for just compensation afforded by the federal Tucker Act before it can bring a claim for declaratory relief.[20]

---

[19] To the extent Purgatory relies on federal laws other than § 3210(a) of ANILCA to support its argument that it has a right of access, see 16 U.S.C. § 481; 43 U.S.C. § 661, those claims also fall under the APA, see Utah v. Babbitt, 137 F.3d 1193, 1203 (10th Cir. 1998) (addressing claim under the Federal Land Policy and Management Act ("FLPMA")); Peper, 478 F. App'x at 518, 520 (addressing FLPMA claim), and are thus subject to the APA's waiver of sovereign immunity in 5 U.S.C. § 702.  We exercise our discretion under 28 U.S.C. § 1653 to amend Purgatory's complaint to include reference to that sovereign immunity waiver.  As to these other federal statutory claims, we come to the same conclusion as we reached regarding Purgatory's ANILCA claim—because those claims are "inextricably linked to the question" of whether Purgatory has a right of access, they belong under the QTA. We, therefore, lack jurisdiction to consider those claims under the DJA..

[20] As a threshold jurisdictional issue, we conclude that this request does not need to be brought under the QTA because it does not assert or depend on any preexisting legal right of access.  Indeed, Purgatory expressly argued to the district court that "the DJA claim should be limited to addressing the issues raised in the Complaint that do not resolve Purgatory's right-of-way."  (Aplt. App. 109; see also Aplt. Br. 22 (stating that Purgatory's claim for declaratory relief is being asserted "irrespective of Purgatory's claimed easement").)  Rather, Purgatory asserts only that, even absent Purgatory owning any right of access, the USFS's actions have

"The Takings Clause of the Fifth Amendment . . . prohibits the government from taking private property for public use without just compensation." Palazzolo v. Rhode Island, 533 U.S. 606, 617 (2001). A taking can be either a physical taking or a regulatory taking; a regulatory taking occurs when "government actions do not encroach upon or occupy the property yet still affect and limit its use to such an extent that a taking occurs." Id. (citing Pennsylvania Coal Co. v. Mahon, 260 U.S. 393 (1922)). Here, Purgatory suggests a regulatory taking has occurred.

The typical remedy for a taking is "just compensation." See Knick v. Twp. of Scott, 588 U.S. 180, 201 (2019). Therefore, "[a]s long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking." Id.; see Gordon v. Norton, 322 F.3d 1213, 1216 (10th Cir. 2003) ("[E]quitable relief is not available to enjoin a lawful taking when a property owner can subsequently sue the government for compensation.").

Generally, compensation for a taking may be obtained under the federal Tucker Act, which provides: "The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department . . . ." 28 U.S.C. 1491(a)(1); see Gordon, 322 F.3d at 1216. Thus, "taking claims against the Federal Government are premature until the property

---

effected a taking of its Water Rights. Such a claim does not depend on a preexisting legal right of access and, therefore, does not belong under the QTA. However, for reasons discussed below, we offer no opinion on the merits of this claim.

owner has availed itself of the process provided by the Tucker Act." Preseault v.
I.C.C., 494 U.S. 1, 11–12 (1990) (quoting Williamson Cnty. Reg'l Planning Comm.
v. Hamilton Bank, 473 U.S. 172, 195 (1985), overruled in part on other grounds by
Knick, 588 U.S. at 184–85; Gordon, 322 F.3d at 1216–17 ("[I]f a Tucker Act remedy
is available, plaintiffs must first avail themselves of the process provided by the
Tucker Act and file suit in the Court of Claims for compensation.").

In the present case, Purgatory has not made a Tucker Act claim despite that
remedy being generally available, so Purgatory's request seeking a declaratory
judgment based on the federal Takings Clause must be dismissed for lack of
prudential ripeness. See N. Mill St., LLC v. City of Aspen, 6 F.4th 1216, 1227–29
(10th Cir. 2021); Gordon, 322 F.3d at 1218.[21]

Purgatory argues that the Supreme Court established the broad availability of
declaratory relief for takings when it stated in Eastern Enterprises v. Apfel that, "the
Declaratory Judgment Act 'allows individuals threatened with a taking to seek a
declaration of the constitutionality of the disputed governmental action before

---

[21] In Gordon, we understood the availability of a Tucker Act remedy to
preclude our exercise of jurisdiction over a takings claim seeking equitable relief.
Gordon, 322 F.3d at 1218 ("[B]ecause a Tucker Act remedy is available, the district
court lacked subject matter jurisdiction over plaintiffs' takings claims."). However,
the Supreme Court has since clarified that the requirement for a plaintiff to seek just
compensation (such as through the Tucker Act) prior to bringing an equitable claim
"is not, strictly speaking, jurisdictional." Horne v. Dep't of Agric., 569 U.S. 513,
525–26 (2013); see N. Mill St., 6 F.4th at 1227–29 (recognizing that Horne
invalidated our prior precedent). Rather, the requirement implicates prudential
ripeness. N. Mill St., 6 F.4th at 1229. Therefore, this request is properly dismissed
for failure to state a claim upon which relief can be granted, rather than for lack of
jurisdiction. Id. at 1230.

potentially uncompensable damages are sustained.'"  524 U.S. 498, 521 (1998) (quoting Duke Power Co. v. Carolina Env't Study Grp., Inc., 438 U.S. 59, 71 n.15 (1978)).  In that case, the plaintiff coal mine operators argued that a statute requiring them to pay premiums into a health benefit plan for their employees effected an uncompensated taking.  Id. at 514, 518.  After acknowledging that the availability of compensation through the Tucker Act generally precluded equitable relief in a takings claim, a plurality of the Supreme Court held that "the presumption of Tucker Act availability must be reversed where the challenged statute, rather than burdening real or physical property, requires a direct transfer of funds mandated by the Government."  Id. at 521 (internal quotation marks omitted).  The plurality reasoned that "a claim for compensation would entail an utterly pointless set of activities" because the plaintiff would be suing under the Tucker Act for the exact funds that had just been taken.  Id. (internal quotation marks omitted).  Therefore, "it [could not] be said that monetary relief against the Government [was] an available remedy" because "Congress could not have contemplated that the Treasury would compensate coal operators for [the premiums]."  Id.

Read in context, the plurality's statement that declaratory relief can be available for a plaintiff alleging a taking is confined to situations in which an "adequate provision for obtaining just compensation" is not available, such as when the alleged taking involves transfers of money to the government rather than the burdening of physical property.  See Knick, 588 U.S. at 201; E. Enters., 524 U.S. at 521; see also LTV Steel Co. v. Shalala (In re Chateaugay Corp.), 53 F.3d 478, 493

35

(2d Cir. 1995) (concluding that, with respect to the availability of declaratory and injunctive relief, "a distinction must be drawn between (a) statutes burdening real and tangible property, and (b) those requiring direct transfers of money to the government").  Indeed, we have expressly rejected a broad interpretation of Eastern Enterprises that would apply its language to takings of physical property:

> The plurality in Eastern Enterprises distinguished takings of physical property and recognized that a Tucker Act remedy is available for such takings.  Accordingly, there is no reason to reverse the presumption of Tucker Act applicability to plaintiffs' takings claims for the loss of physical property. . . . The nature of the alleged taking in Eastern Enterprises was noteworthy because it was clear that Congress had not contemplated that a plaintiff who alleged the taking of a sum of money would be required to sue the government under the Tucker Act for the return of the sum of money.

Gordon, 322 F.3d at 1218 (internal citations omitted).

Purgatory responds that Eastern Enterprises relied not only on the distinction between physical property and a sum of money, but also on the fact that there might be "potentially uncompensable damages."  E. Enters., 524 U.S. at 521 (quoting Duke Power, 438 U.S. at 71 n.15); see Knick, 588 U.S. at 201 ("As long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking." (emphasis added)).  Purgatory argues that the taking of its Water Rights is similarly uncompensable because "money will not replace the needed water."  (Aplt. Reply Br. 20.)  In support of this argument, Purgatory explains that it lacks other ways to obtain water and that the water available only through the Water Rights is necessary for it to proceed with its already approved plans for future upgrades and development: "In short, water is essential to

36

the success of the Resort and Purgatory has relied on the availability of the . . . Water Rights for decades." (Id.)

We are not persuaded the Tucker Act remedy is inadequate for Purgatory. Courts have long held that remedies like the Tucker Act are generally adequate for takings of physical property. See Knick, 588 U.S. at 205 ("As long as just compensation remedies are available—as they have been for nearly 150 years—injunctive relief will be foreclosed."). We recognize there are exceptions in certain limited circumstances. See, e.g., Pharm. Research & Manufacturers of Am. v. Williams, 64 F.4th 932, 945 (8th Cir. 2023) (finding monetary compensation inadequate to remedy a taking when the plaintiff would be forced to "litigate a multiplicity of suits" to secure that compensation). But Purgatory points to no case holding monetary compensation inadequate to remedy a one-time taking of physical property simply because the plaintiff relied on the property's substantial economic potential. We are not persuaded that the value of Purgatory's Water Rights is so large and immeasurable that monetary compensation cannot be adequate. Therefore, we dismiss Purgatory's request for a declaratory judgment based on an alleged federal Takings Clause violation for lack of prudential ripeness.[22]

---

[22] To the extent Purgatory alleges a taking under Art. II § 15 of the Colorado Constitution, we lack federal question jurisdiction over such a claim. Since Purgatory has not alleged any other basis of subject-matter jurisdiction, that request for declaratory relief must be dismissed for lack of jurisdiction.

## IV.    CONCLUSION

In sum, we conclude, as to Claim I, that Purgatory's action to quiet title to an easement over federal land to access its Water Rights is barred by the QTA's twelve-year statute of limitations.  As for Purgatory's three requests for declaratory relief in Claim II, we conclude that we lack jurisdiction over two of them and the third must be dismissed for lack of prudential ripeness.  Accordingly, we AFFIRM the district court's dismissal of both claims.